925 F.2d 1527
 John Charles LESKO, Appellant,
v.
Joseph LEHMAN, Commissioner of the Pennsylvania Department
of Corrections; Charles Zimmerman, Superintendent of the
State Correctional Institution at Graterford; Joseph P.
Mazurkiewicz, Superintendent of the State Correctional
Institution at Rockview; James J. Haggerty, General Counsel
of Pennsylvania; and Ernest D. Preate, Jr., Attorney
General of the Commonwealth of Pennsylvania, Appellees.
 No. 90-3295.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 10, 1990.
Decided Feb. 11, 1991.
Rehearing and Rehearing In Banc Denied March 11, 1991.
 
 Welsh S. White (argued), Pittsburgh, Pa., Rabe F. Marsh, III, Greensburg, Pa., for appellant.
 Robert A. Graci (argued), Chief Deputy Atty. Gen., Appeals & Legal Services Section, Office of Atty. Gen. of Pennsylvania, Harrisburg, Pa., John W. Peck, Asst. Dist. Atty., Sp. Deputy Atty. Gen., Office of Dist. Atty., Greensburg, Pa., for appellees.
 Before HIGGINBOTHAM, MANSMANN and COWEN, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 Appellant John Charles Lesko was convicted and sentenced to death by the Westmoreland County Court of Common Pleas for the murder of Leonard Miller, an officer of the Apollo, Pennsylvania police department. This is the second appeal involving Lesko's petition for a writ of habeas corpus. On July 27, 1989, we reversed the district court's issuance of the writ, holding that Lesko was not deprived of a fair trial by the introduction at trial of evidence of his role in the prior murder of William Nicholls. We remanded for consideration of Lesko's other habeas claims. Lesko v. Owens, 881 F.2d 44 (3d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990). On remand, the district court dismissed Lesko's habeas petition after considering and rejecting those other claims.
 
 
 2
 We now hold that the district court erred in failing to hold an evidentiary hearing on Lesko's claim that the introduction of evidence of his guilty plea to the Nicholls murder at the penalty phase of his trial violated his due process rights. We also hold that the jury's sentencing determination was tainted by improper prosecutorial comments during the penalty phase. Accordingly, we will reverse and remand to the district court for the issuance of a conditional writ of habeas corpus insofar as Lesko's death sentence is concerned. We will affirm the dismissal of the petition insofar as Lesko challenges the jury's guilty verdict, as we find no errors of constitutional significance in the determination of Lesko's guilt.
 
 I. BACKGROUND AND PROCEDURAL HISTORY
 
 3
 In our prior opinion, we summarized the facts underlying Lesko's conviction and death sentence.
 
 
 4
 In the early hours of January 3, 1980, John Lesko, Michael Travaglia and Richard Rutherford were cruising the outskirts of the city of Pittsburgh in a stolen sports car. The trio drove past police officer Leonard Miller, sitting in his patrol car parked at the side of the road outside the Stop-and-Go convenience store. Travaglia, the driver of the car, stated that he "wanted to have some fun with this cop." Travaglia raced past the officer's car beeping his horn, but no pursuit followed. Travaglia turned the car around, again sped past the patrol car, and again failed to elicit a response. The third time Travaglia sped past, Officer Miller turned on his lights and gave chase. Lesko turned to Rutherford in the back seat and cautioned him to "lay down in the back, because it might turn into a shooting gallery."
 
 
 5
 A moment later, Officer Miller managed to force the sports car off the side of the road. The officer approached the car on foot. Travaglia rolled down his window, extended his .38 caliber hand gun, and shot Officer Miller twice from close range. Officer Miller returned fire, shattering the passenger side of the window. The three companions sped away. The gunshot wounds Officer Miller received proved fatal.
 
 
 6
 The trio had begun their escapade together a few hours earlier, in the late evening of January 2, 1980, at a hot dog shop in Pittsburgh. At Travaglia's instruction, Lesko and Rutherford went to the alleyway behind the Edison Hotel, and waited. About ten minutes later a sports car appeared. Travaglia sat in the front seat beside the driver and owner of the car, William Nicholls, a stranger. While Lesko and Rutherford were climbing into the back seat, Travaglia pulled out a .22 caliber hand gun and shot Nicholls in the arm.
 
 
 7
 After Travaglia took the driver's seat, Lesko told Rutherford to handcuff Nicholls behind the back. As Travaglia drove, Lesko repeatedly punched Nicholls in the face and chest, calling him a queer. Lesko asked Nicholls if he wanted to perform oral sex on him, and taunted him with a knife. Meanwhile, Lesko took Nicholls's belongings, a wallet and an extra set of keys, and told Rutherford to place them in the glove compartment. After Nicholls lost consciousness, Rutherford and Lesko gagged him with a scarf. Travaglia stopped the car near a lake in a wooded area. Lesko propped Nicholls against a nearby tree, his hands cuffed, his mouth gagged, and his feet bound with a belt. Travaglia and Lesko dragged Nicholls down to the lake and rolled him into the water, where he disappeared.
 
 
 8
 The three men drove to Travaglia's father's house, where Travaglia knew his father kept a gun. Lesko and Rutherford waited in the car while Travaglia entered the house. Travaglia returned with a .38 caliber handgun, which he handed to Lesko. Upon inspection, Lesko discovered that it contained only bird shot. Travaglia, who had begun driving away, turned the car around and returned to his father's house. Travaglia instructed Rutherford to retrieve the box of bullets lying in the trunk of the car parked inside the garage. Lesko stood guard outside. Armed with the gun that had wounded Nicholls, Lesko warned Rutherford that if anything went wrong, Rutherford "had six shots to get out." Rutherford returned with the box of bullets, and the trio drove off. It was these bullets that killed Officer Miller.
 
 
 9
 After the Miller shooting, Lesko and Travaglia returned to Pittsburgh. At the hot dog shop they met a friend, Keith Montgomery, whom they took to a room in the Edison Hotel and told about the Miller shooting. Travaglia told Montgomery, "I shot a cop." Lesko added, "I wanted to." Travaglia then gave Montgomery the .38 caliber gun used to shoot Officer Miller. When the Pittsburgh police found Montgomery with that same gun later that evening, Montgomery told the police how he had gotten the gun, and that it had been used to shoot a policeman. Lesko and Travaglia were arrested that night. Before surrendering, Lesko pointed a gun at tSU21 After receiving Miranda warnings, Lesko and Travaglia each gave statements admitting involvement in the killing of Officer Miller. Lesko told the police that he and Travaglia had instigated the car chase with Officer Miller, "So he'd be chasing us ... and the car was fast and that--we'd lose him and could go and knock off the Stop-N-Go." In contrast, Travaglia told the police that he was "playing around with [Officer Miller], trying to aggravate him, and I figured he couldn't chase me across county lines; and since he did, I figured if I pointed the gun at him and told him to throw his gun away, he couldn't stop me and I could keep on going. In the process of pulling the gun on him, the hammer slipped and the shot discharged." Lesko and Travaglia also admitted killing William Nicholls.
 
 
 10
 Lesko, 881 F.2d at 46-47.
 
 
 11
 After their capture, Lesko and Travaglia faced murder charges in the Court of Common Pleas of Indiana County for the Nicholls homicide and in the Court of Common Pleas of Westmoreland County for the Miller homicide. Lesko was represented at all relevant periods in the Indiana County proceedings by John Armstrong. He was represented throughout the Westmoreland County proceedings by his present counsel.
 
 A. Indiana County Guilty Plea
 
 12
 On May 19, 1980, Lesko pled guilty in Indiana County to second degree murder. No written record of a plea agreement exists, but Armstrong and the Indiana County prosecutor stated at the plea hearing that Lesko's guilty plea was made with the understanding that the other charges related to the Nicholls murder would be dismissed and that sentencing on the murder charge would be delayed until "late June." Record of Guilty Plea Proceedings (May 19, 1980) at 32. Although the parties now disagree about the purposes underlying the agreement to defer sentencing, it is undisputed that, as a minimum, Armstrong and the prosecutor intended that sentencing be delayed until the conclusion of Lesko's trial in Westmoreland County.[1] On December 3, 1980, before a sentence had been imposed, Armstrong filed a motion to withdraw Lesko's Indiana County guilty plea, stating that his client wished to stand trial for the charges related to the Nicholls homicide.
 
 B. Westmoreland County Proceedings
 
 13
 In January 1981, Lesko and Travaglia were tried jointly in Westmoreland County for the Miller homicide. We have previously summarized the guilt phase of this trial.
 
 
 14
 At trial, Lesko and Travaglia's sole defense to the charge of first degree murder was that they each lacked the requisite intent to kill. Lesko's counsel argued principally that his client was at most guilty of felony-murder. He argued that in instigating the police chase, defendants planned first to divert the officer from the Stop-and-Go store, and later return to rob the establishment. Therefore, Lesko's lawyer urged, the killing was not pre-meditated, but was the unintended result of a botched robbery attempt. Travaglia's lawyer, meanwhile, emphasized that pulling the trigger had been accidental, a result of the hammer of the gun having slipped as Travaglia aimed at the officer. Neither defendant testified at the guilt phase of the trial. However, statements they made in their taped confessions to the police, which the Commonwealth introduced into evidence, were relied on by defense counsel in support of their respective defense theories.
 
 
 15
 Lesko, 881 F.2d at 47-48.
 
 
 16
 Rutherford was the Commonwealth's principal witness at trial. Over defense objections, Rutherford testified about both defendants' roles in the abduction and killing of Nicholls and in the events surrounding the Miller homicide.
 
 
 17
 On January 30, 1981, the jury found Lesko and Travaglia guilty of murder in the first degree and criminal conspiracy to commit murder. Pursuant to the jury trial procedure specified in Pennsylvania's death penalty statute, 42 Pa.Cons.Stat. Ann. Sec. 9711(a), the trial then proceeded to its penalty phase. The prosecution introduced as a statutory "aggravating circumstance" the fact that defendants had pled guilty in Indiana County to the Nicholls murder.[2] Counsel for both defendants objected to this testimony on the grounds that the Indiana County convictions were not "final" because sentences had not yet been imposed, and that both men had pled guilty with the understanding that their pleas could not be used against them in the Westmoreland County trial. Trial Transcript ("Tr.") at 1338-39. Lesko's counsel also objected on the basis of his client's still pending motion in Indiana County to withdraw his guilty plea. Tr. at 1404, 1427-29. The trial court denied counsel's motion for an evidentiary hearing on the status of that motion. Tr. at 1429.
 
 
 18
 Lesko introduced mitigating testimony from his mother, aunt, former girlfriend, and his former girlfriend's mother about his background and character. Tr. at 1627-49. He also provided testimony of a biographical nature. He testified that he never knew his father, and that his mother gave him up to an orphanage when he was seven or eight years old. When he was fourteen, he was returned to his grandmother. He recalled that he had attended a number of schools and was a "straight A" student in the eleventh grade, after which he enlisted in the Marine Corps. He served in the Marines from March 1976 until his administrative discharge in December 1978. He returned to the Pittsburgh area, where he "bounced from job to job." He testified that he first met Michael Travaglia in late November 1979. He was not asked about, and did not discuss, the events surrounding the Nicholls and Miller murders. The prosecutor did not cross-examine Lesko.[3] Tr. at 1651-62.
 
 
 19
 On February 3, 1981, the jury returned death verdicts against both defendants. As to Lesko, the jury found both aggravating circumstances offered by the prosecution and further found that the aggravating circumstances outweighed the mitigating circumstances.
 
 
 20
 On direct appeal to the Pennsylvania Supreme Court, Lesko argued that the Commonwealth had breached the Indiana County plea agreement by introducing evidence of the plea as an aggravating circumstance. However, the Pennsylvania Supreme Court did not discuss this issue in its majority opinion and order affirming both defendants' convictions and sentences. Commonwealth v. Travaglia, 502 Pa. 474, 467 A.2d 288 (1983), cert. denied, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984); but see 502 Pa. at 507-08, 467 A.2d at 305 (Nix, J., concurring) ("I ... join in the Court's mandate today with the caveat that the death penalty will be carried out only after a review of [the challenges to the pleas] by this Court and only if after such review it is determined that the pleas were voluntarily and knowingly entered and the request for withdrawal was properly refused.").
 
 
 21
 C. Indiana County Post-Guilty Plea Proceedings
 
 
 22
 On April 13, 1981, Armstrong filed an amended motion to withdraw Lesko's Indiana County guilty plea, asserting, inter alia, that an essential element of this plea agreement was "the Commonwealth's assurance that he would not be sentenced until after the trials in Westmoreland County. Implicit in this expressed promise by the Commonwealth was the fact that this plea in Indiana County couldn't be used in the trial or sentence in Westmoreland County."
 
 
 23
 The Indiana County court held a hearing on this motion on April 28, 1981. Lesko did not testify at this hearing. Armstrong also did not testify.[4] However, during the hearing Armstrong argued that "implicit" in counsel's agreement to defer sentencing in Indiana County was the understanding that the plea would not be used against Lesko at the Westmoreland County trial. Record of Proceedings on Motion to Withdraw Guilty Plea (April 28, 1981) at 9. Armstrong also acknowledged that he believed that until sentence was imposed, Lesko's guilty plea did not constitute a "conviction" and thus could not be introduced at the Westmoreland trial. Id. at 6-7.[5]
 
 
 24
 On June 5, 1981, the court denied Lesko's motion to withdraw his guilty plea. It is evident from the court's "Finding of Facts" that its decision was based on its conclusion that the colloquy at the May 19, 1980 plea hearing embodied the entire plea agreement. The court found that "[t]he promise in the instant case was that the defendant's sentence for second degree murder would be delayed; there was no promise on behalf of the Commonwealth, nor request by the defendant, that evidence of the defendant's Indiana County guilty plea would not be used against him at other trials." Opinion and Order of the Court (June 5, 1981) at 7.
 
 
 25
 On appeal, the Pennsylvania Supreme Court affirmed Lesko's Indiana County conviction, holding that Armstrong was not ineffective for advising Lesko to plead guilty. The court also upheld the trial court's denial of Lesko's motion to withdraw the guilty plea. Commonwealth v. Lesko, 502 Pa. 511, 467 A.2d 307 (1983), cert. denied, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984). Again, the court's decision was premised on the fact that the plea colloquy did not reveal a promise by the Commonwealth not to use the guilty plea at the Westmoreland County trial. 502 Pa. at 518, 467 A.2d at 310.
 
 D. PCHA Proceedings
 
 26
 On April 15, 1985, Lesko filed in Indiana County a petition under Pennsylvania's Post Conviction Hearing Act ("PCHA"), 42 Pa.Cons.Stat. Ann. Secs. 9541-9551, alleging that Armstrong was ineffective for advising him that his guilty plea could not be used as an aggravating circumstance. On April 23, 1985, this petition was denied without a hearing on the ground that this issue had been determined in the direct appeal from the Indiana County conviction. Commonwealth v. Lesko, No. 35 Crim., 1980 (Indiana Co.Ct. Common Pleas April 23, 1985), appeal quashed as untimely, 357 Pa.Super. 636, 513 A.2d 1077 (1986), allocatur denied, 514 Pa. 616, 521 A.2d 931 (1987).
 
 
 27
 Lesko also raised his guilty plea issue in a PCHA petition filed in Westmoreland County. The trial court convened a hearing on this petition on January 28, 1985, but rejected Lesko's proffer of testimony from Armstrong about his plea negotiations with the Indiana County district attorney and about his conversations with Lesko concerning the terms of the plea agreement. Post Conviction Hearing Proceeding Transcript (April 23, 1985) at 3-4, 7-14.[6] The court specifically rejected counsel's attempt to raise the "new issue" of whether there was "an understanding between counsel and the basis of the defendant's plea [sic] that the guilty plea in Indiana County would not be introduced in Westmoreland County." Id. at 8. The court considered that the proffered testimony was irrelevant because the Westmoreland County court was not bound by the terms of the Indiana County plea agreement. The court also believed that the guilty plea issue was finally litigated in the direct appeal from the Indiana County conviction.
 
 
 28
 The Pennsylvania Supreme Court affirmed the denial of Lesko's Westmoreland County PCHA petition. Commonwealth v. Lesko, 509 Pa. 67, 501 A.2d 200 (1985), cert. denied, 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987). The Court determined that Lesko's argument that he "believed" the plea could not be used against him in Westmoreland County was a mere "variant" of the argument that Armstrong had made in his motion to withdraw the guilty plea--namely, that the commitment not to introduce the plea in Westmoreland County was an "implicit" term of the plea agreement. The court agreed with the trial court that this issue had been finally determined in the direct appeal from Lesko's Indiana County conviction, stating that "[t]he terms of the bargain do not contain the agreement appellant now says he 'believed' was 'implicit' in it." 509 Pa. at 85, 501 A.2d at 208-09.
 
 E. Habeas Corpus Proceedings
 
 29
 On June 11, 1986, Lesko filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Pennsylvania. On May 2, 1988, the district court issued the writ, holding that Lesko's right to a fair trial was violated by the introduction of extensive evidence of Lesko's role in the Nicholls murder. Lesko v. Jeffes, 689 F.Supp. 508 (W.D.Pa.1988). On appeal, this court reversed, concluding that evidence relating to the Nicholls murder was relevant to show motive and intent, and that its prejudicial effect did not so outweigh its probative value that its admission denied Lesko a fair trial. Lesko v. Owens, 881 F.2d 44 (3d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990). We remanded the case to the district court for resolution of the remaining issues raised by Lesko's habeas petition.
 
 
 30
 On remand, the district court referred the matter to a United States Magistrate, who filed a report and recommendation rejecting the balance of Lesko's habeas claims. On April 12, 1990, the district court approved and adopted the magistrate's report, dismissed the habeas petition, and granted a certificate of probable cause to appeal. This appeal followed.
 
 
 31
 We have subject matter jurisdiction under 28 U.S.C. Sec. 2254, and appellate jurisdiction under 28 U.S.C. Sec. 1291. This court has already determined that Lesko has exhausted his state court remedies. Lesko, 881 F.2d at 50.[7]
 
 II. DISCUSSION
 
 32
 Lesko raises the following issues in this appeal:
 
 
 33
 1. Whether he is entitled to an evidentiary hearing on his claim that the introduction of his Indiana County guilty plea at the penalty phase of the Westmoreland County trial violated due process, because he had allegedly pled guilty with the understanding that his plea would not be used against him at trial;
 
 
 34
 2. Whether the exclusion for cause of a veniremember who expressed her personal opposition to the death penalty during voir dire violated Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968);
 
 
 35
 3. Whether certain remarks in the prosecutor's closing argument in the penalty phase of the trial constituted an improper and inflammatory "appeal to vengeance";
 
 
 36
 4. Whether certain remarks in the prosecutor's closing argument in the penalty phase of the trial constituted an impermissible comment on Lesko's failure to testify on the merits of the charges against him;
 
 
 37
 5. Whether the trial court erred in instructing the jury that it should not consider sympathy in its penalty determination;
 
 
 38
 6. Whether the death penalty for Lesko, a non-triggerman accomplice to the murder of Officer Miller, is an unconstitutionally disproportionate penalty;
 
 
 39
 7. Whether the Pennsylvania death penalty statute is unconstitutional as applied because the jury is allowed to return a verdict on non-capital degrees of homicide (in this case, voluntary manslaughter) "even when there is no evidence to sustain such a verdict";
 
 
 40
 8. Whether the Pennsylvania death penalty statute is unconstitutional because it requires the defendant to establish the existence of mitigating circumstances by a preponderance of the evidence; and
 
 
 41
 9. Whether the trial court erred in allowing the jury to hear "gruesome details" of Lesko's role in the Nicholls homicide.
 
 A. Scope of Review
 
 42
 We recently summarized the scope of our review of a district court decision which denies a habeas petition without a hearing.
 
 
 43
 Our scope of review is limited as we sit not to retry state cases de novo but rather to examine the proceedings in the state court to determine if there has been a violation of federal constitutional standards. Milton v. Wainwright, 407 U.S. 371, 377, 92 S.Ct. 2174, 2177, 33 L.Ed.2d 1 (1972). Accordingly, we do not exercise the supervisory power that we might possess on an appeal from a conviction in the district court. Donnelly v. DeChristoforo, 416 U.S. 637, 642-43, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). Where, as here, a district court has denied a petition for habeas corpus without holding an evidentiary hearing, our review consists of a two-step analysis. Smith v. Freeman, 892 F.2d 331, 338 (3d Cir.1989) (citing Toomey v. Clark, 876 F.2d 1433, 1435 (9th Cir.1989)). First, we determine whether the petitioner has alleged facts that, if proved, would entitle him to relief. Smith, 892 F.2d at 338 (citing Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963); Toomey, 876 F.2d at 1435). If so, we must then decide whether an evidentiary hearing is necessary to establish the truth of those allegations. Smith, 892 F.2d at 338 (citing Townsend, 372 U.S. at 312-19, 83 S.Ct. at 756-60; Toomey, 876 F.2d at 1435).
 
 
 44
 Zettlemoyer v. Fulcomer, 923 F.2d 284, 291 (3d Cir.1991). Our review of the district court's decision in this case is plenary, as the dismissal of the habeas petition was based on the state court record, and not on independent factfinding by the district court. Id. at 291 n. 5.
 
 
 45
 Applying these standards, we conclude that the district court erred in failing to hold an evidentiary hearing on Lesko's guilty plea claim (Issue 1), and in rejecting his claims based on the prosecutor's closing argument. (Issues 3 and 4). We agree with the district court that there is no merit in Lesko's other claims.
 
 B. Indiana County Guilty Plea
 
 46
 Lesko claims that the Commonwealth's use of his Indiana County guilty plea as an aggravating circumstance in the Westmoreland trial was a violation of due process, as he had pled guilty with the understanding that the plea would not be so used. He asserts that his understanding "stemmed directly and reasonably from statements made to him by his Indiana County counsel [John Armstrong] and that these representations played a material part in inducing his guilty plea." Appellant's Brief at 16.
 
 
 47
 Pursuant to the two-step analysis described above, we shall first determine whether Lesko's allegations, if true, describe a due process violation. We shall then discuss whether the district court erred in denying this claim without an evidentiarPH1H1. Due Process violation
 
 
 48
 We begin our first inquiry with a recognition that a counseled and voluntary guilty plea may not be collaterally attacked in a habeas corpus action. Mabry v. Johnson, 467 U.S. 504, 508, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984). As the Supreme Court has recently emphasized:
 
 
 49
 A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence. Accordingly, when the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary. If the answer is in the affirmative then the conviction and the plea, as a general rule, foreclose the collateral attack.
 
 
 50
 United States v. Broce, 488 U.S. 563, 109 S.Ct. 757, 762, 102 L.Ed.2d 927 (1989).
 
 
 51
 In this case, Lesko asserts that the introduction of his guilty plea at the penalty phase undermined the plea's voluntary character, as he had pled guilty with the understanding that the plea would not be so used. As he points out, a guilty plea which is induced by promises or threats from counsel that deprive it of its voluntary character is void. A conviction or a sentence which is based on an involuntary plea may be collaterally challenged. See Santobello v. New York, 404 U.S. 257, 261-62, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971); Machibroda v. United States, 368 U.S. 487, 493, 82 S.Ct. 510, 513, 7 L.Ed.2d 473 (1962). The standard for determining whether a guilty plea is "voluntary" for purposes of the U.S. Constitution is a question of federal law, but the determination of the historical facts surrounding the plea bargain is subject to the deferential "presumption of correctness" of 28 U.S.C. Sec. 2254(d). Marshall v. Lonberger, 459 U.S. 422, 431, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983).
 
 
 52
 A habeas petitioner faces a heavy burden in challenging the voluntary nature of his guilty plea, for the plea hearing is specifically designed to uncover hidden promises or representations as to the consequences of a guilty plea. As the Supreme Court stated in Blackledge v. Allison, 431 U.S. 63, 73-74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977), "the representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity." Id. at 73-74, 97 S.Ct. at 1629.
 
 
 53
 However, the Blackledge Court emphasized that while the record of a plea hearing is an "imposing" barrier to habeas relief, it is not "invariably insurmountable."
 
 
 54
 In administering the writ of habeas corpus ..., the federal courts cannot fairly adopt a per se rule excluding all possibility that a defendant's representations at the time his guilty plea was accepted were so much the product of such factors as misunderstanding, duress, or misrepresentation by others as to make the guilty plea a constitutionally inadequate basis for imprisonment.
 
 
 55
 Id. at 75, 97 S.Ct. at 1629-30.
 
 
 56
 A petitioner challenging the voluntary nature of a facially valid guilty plea on the basis of unfulfilled promises or representations by counsel must advance specific and credible allegations detailing the nature and circumstances of these statements. See Machibroda, 368 U.S. at 495, 82 S.Ct. at 514; Blackledge v. Allison, 431 U.S. at 74, 97 S.Ct. at 1629. A collateral challenge to a guilty plea may be summarily dismissed "when [the petitioner's] allegations of an unkept promise are inconsistent with the bulk of his conduct, and when he offers no detailed and specific facts surrounding the agreement." Davis v. Butler, 825 F.2d 892, 894 (5th Cir.1987).
 
 
 57
 Lesko's specific and corroborated allegations, and the circumstances surrounding his guilty plea, satisfy this threshold standard. Lesko alleges that he "entered the Indiana County guilty plea with the understanding that a plea agreement had been entered into between [Armstrong] and the Indiana County prosecutor under which one of the terms of the plea was that Lesko's Indiana plea would not be used against him in the Westmoreland County prosecution." Appellant's Brief at 16. Although Lesko's Indiana County counsel has not yet been afforded the opportunity to testify concerning the plea negotiations, Armstrong has steadfastly maintained, in the state court proceedings and in an affidavit submitted at our direction,[8] that he believed that he had a commitment from the Indiana County prosecutor not to use the guilty plea in the Westmoreland proceeding, and that he communicated this belief to Lesko.
 
 
 58
 Based on all of Lesko's and Armstrong's allegations, if true, it is clear that Lesko believed that the plea agreement included a "non-use" promise by the Indiana County prosecutor. A plea entered on that basis would not be voluntary, and a sentence based on such a plea may be collaterally attacked.[9] See Blackledge v. Allison, 431 U.S. at 75-76, 97 S.Ct. at 1629-30 (habeas claim supported by petitioner's "specific factual allegations" that he was induced to plead guilty by his attorney's representation that he had obtained a commitment from the prosecutor and the judge for a more lenient sentence than the one actually imposed); Davis, 825 F.2d at 894-95 (habeas claim supported by specific, detailed contention that petitioner had pled guilty because of his counsel's assurance that he would be pardoned three years after sentencing); United States v. Marzgliano, 588 F.2d 395, 397-99 (3d Cir.1978) (Sec. 2255 claim supported by specific and corroborated allegations that defense counsel had misled defendant about sentencing provisions of plea agreement); McAleney v. United States, 539 F.2d 282 (1st Cir.1976) (defendant in Sec. 2255 action permitted to withdraw plea because of counsel's misrepresentation that prosecutor would recommend light sentence); United States v. Valenciano, 495 F.2d 585 (3d Cir.1974) (Sec. 2255 claim supported by allegations that defense counsel had failed to advise client of special parole term, and had incorrectly informed him that two sentences would be concurrent, rather than consecutive); Moorhead v. United States, 456 F.2d 992, 995 (3d Cir.1972) (defendant permitted to collaterally attack guilty plea because of his attorney's misrepresentation that the prosecutor would recommend probation or suspended sentence).
 
 
 59
 We therefore turn to our second inquiry: whether the district court erred in denying Lesko an evidentiary hearing on his guilty plea claim.
 
 2. Necessity for Evidentiary Hearing
 
 60
 In Valenciano, a Sec. 2255 case, we stated that "[w]here the voluntariness of the plea is attacked with an assertion that one's counsel or the prosecutor, or both, made an out-of-court arrangement or 'proposition' as to the outcome of a sentence which differs from that pronounced by the court, an evidentiary hearing will ordinarily be necessary on a Sec. 2255 motion attacking the voluntariness of the plea." 495 F.2d at 587. When a Sec. 2254 petitioner raises material disputed facts which, if true, would entitle the petitioner to relief, the district court also must hold an evidentiary hearing, "if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of trial or in a collateral proceeding." Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963). The Supreme Court has held that evidentiary hearings are required under the following circumstances:
 
 
 61
 (1) the merits of the factual dispute were not resolved at the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.
 
 
 62
 Id. at 313, 83 S.Ct. at 757; see also Smith v. Freeman, 892 F.2d at 338; Mayberry v. Petsock, 821 F.2d 179, 185 (3d Cir.), cert. denied, 484 U.S. 946, 108 S.Ct. 336, 98 L.Ed.2d 362 (1987); Sullivan v. Cuyler, 723 F.2d 1077, 1084 (3d Cir.1983). Congress has for the most part codified the Townsend criteria in 28 U.S.C. Sec. 2254(d), which provides that a habeas court shall accord a presumption of correctness to "a determination after a hearing on the merits of a factual issue" made in the course of the petitioner's state court proceedings. This presumption may be rebutted by a showing that the state court determination was deficient for one of the reasons specified in Townsend.
 
 
 63
 The district court concluded that in the plea hearing itself, and in the hearing on Lesko's motion to withdraw his guilty plea, the state courts provided a "full record" on the facts underlying Lesko's present guilty plea claim, and thus an evidentiary hearing in federal court was unnecessary. Magistrate's Opinion at 9. We disagree.
 
 
 64
 Indisputably, there was no mention in the plea colloquy of the prosecutor's alleged commitment not to use Lesko's guilty plea against him in Westmoreland County. However, the plea colloquy does not negate the possibility that Lesko understood the prosecutor's alleged "non-use" agreement to be subsumed in counsels' explicit agreement to delay sentencing on the Indiana County murder charge. The later hearing on Lesko's motion to withdraw his guilty plea also did not constitute the requisite "full and fair" hearing on Lesko's voluntariness claim. It is clear from the transcript of this hearing, and from the characterization of the record by the state trial and appellate courts, that judicial review was restricted to the issue of the existence of an agreement not to use the Indiana plea at the Westmoreland trial. The state courts rested their determination that there was no such agreement mentioned in the plea colloquy itself or in the later testimony from the Indiana County prosecutor at the hearing on Lesko's motion to withdraw his plea. The courts never fully addressed, and did not finally resolve, the distinct issue of the voluntary nature of Lesko's plea.
 
 
 65
 On habeas review, the presumption of correctness of state court factfinding is inapplicable "if the merits of the factual dispute are not resolved at the state hearing. In such circumstances, the federal court must grant an evidentiary hearing to a habeas applicant." Sullivan, 723 F.2d at 1084; see also 28 U.S.C. Sec. 2254(d)(1). Lesko raises a genuine factual issue about the voluntariness of his plea by his specific and corroborated allegation that Armstrong represented to him that he had secured a "non-use" agreement from the prosecutor. This critical issue has not yet been finally resolved in an evidentiary hearing in either his state or federal proceedings. Accordingly, we will remand this case to the district court to conduct such a hearing.[10]
 
 C. Prosecutor's Closing Argument
 
 66
 Lesko did not testify during the guilt phase of the trial. At the penalty phase, he and his witnesses presented mitigating testimony concerning his deprived childhood and family background. Lesko did not testify as to the merits of the charges against him, and he was not cross-examined by the prosecution.
 
 
 67
 In their closing arguments in the penalty phase, defense counsel contended that the death penalty was cruel and ineffective as a deterrent to crime. Tr. at 1665-84. Lesko's counsel urged the jury to consider as mitigating circumstances his client's relatively passive role in the Miller homicide, his young age,[11] and his troubled and impoverished upbringing. Tr. at 1668-73.
 
 
 68
 In his closing argument, the prosecutor made the following comments about Lesko's mitigating evidence concerning his background:[12]
 
 
 69
 Good character and record. All of the character witnesses limited their testimony to a certain period of time ... We heard about John Lesko up to a certain point.
 
 
 70
 And I want you to consider that. John Lesko took the witness stand, and you've got to consider his arrogance. He told you how rough it was, how he lived in hell, and he didn't even have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say that I'm sorry.
 
 
 71
 Tr. at 1697.
 
 
 72
 At the conclusion of his remarks, the prosecutor urged the jurors to abide by their oaths to "follow the law" and not to act like "social activists." He then stated that he could not stop the jury from "show[ing] sympathy," adding:
 
 
 73
 So I'll say this: Show them sympathy. If you feel that way, be sympathetic. Exhibit the same sympathy that was exhibited by these men on January 3rd, 1980. No more. No more.
 
 
 74
 I want you to remember this: We have a death penalty for a reason. Right now, the score is John Lesko and Michael Travaglia two, society nothing. When will it stop? When is it going to stop? Who is going to make it stop? That's your duty.
 
 
 75
 Tr. at 1701-02.
 
 
 76
 Lesko challenges both of the above statements. He argues that the first remark was an impermissible comment on his assertion of his fifth amendment privilege against self-incrimination. He contends that the second comment constituted an "appeal to vengeance" that was "so calculated to inflame the jury and deflect it from its proper performance of its duty that it was in violation of due process of law." Appellant's Brief at 30.
 
 
 77
 The sentencing phase of a death penalty trial is one of the most critical proceedings in our criminal justice system. It is clearly the most critical legal proceeding from the standpoint of the defendant whose life is at stake. Because of the surpassing importance of the jury's penalty determination, a prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices. Justice Sutherland's oft-quoted statement about the unique role of a United States Attorney in criminal prosecutions generally applies with particular force to the prosecuting attorney in the penalty phase of a capital case.
 
 
 78
 The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done ... He may prosecute with earnestness and vigor--indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
 
 
 79
 Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).
 
 
 80
 We are particularly troubled by the prosecutor's comment about Lesko's failure to express remorse, but we believe that both remarks were improper. Considered cumulatively, the errors in the prosecutor's penalty phase argument were not harmless under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
 
 1. Comment on Failure to Express Remorse
 
 81
 Lesko asserts that the prosecutor's remarks about his failure to express remorse constituted a comment on his assertion of his fifth amendment privilege against self-incrimination, in violation of the rule of Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), forbidding such comment. The appellees counter that the prosecutor's statement should not be considered an improper comment on Lesko's failure to testify, because Lesko did in fact testify at the penalty phase. They also characterize the challenged remark as an appropriate exhortation to the sentencing jury to consider Lesko's demeanor.
 
 
 82
 We shall first examine the applicability of the Griffin rule to the circumstances before us, and then discuss whether the rule was violated in this case.
 
 
 83
 a. Applicability of Griffin
 
 
 84
 In Griffin, the Court held that the fifth amendment's self-incrimination clause bars a prosecutor from commenting to the jury on a defendant's failure to testify at trial. The Court reasoned that "comment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." 380 U.S. at 614, 85 S.Ct. at 1232-33 (quoting Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964)).
 
 
 85
 Without attempting to define the outer limits of the fifth amendment privilege in death penalty sentencing proceedings, we conclude that the Griffin rule is applicable in both the guilt and penalty phases of a death penalty trial. We further conclude that a capital defendant does not completely waive his Griffin rights by testifying at the penalty phase solely on mitigating factors that are wholly collateral to the merits of the charges against him.
 
 
 86
 Our first conclusion is mandated by the Supreme Court's decision in Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In that death penalty case, a psychiatrist had testified for the state during the penalty phase, despite the fact that the defendant had not been advised of his Miranda rights before the psychiatric examination. The Court ruled that this testimony violated the defendant's self-incrimination privilege, stating that " 'the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.' " Id. at 462, 101 S.Ct. at 1873 (quoting In re Gault, 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967)). The Court concluded that it could
 
 
 87
 discern no basis to distinguish between the guilt and penalty phases of the respondent's murder trial so far as the protection of the Fifth Amendment is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental guarantees. Any effort by the state to compel respondent to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment.
 
 
 88
 Id. at 462-63, 101 S.Ct. at 1873.
 
 
 89
 Considering the Court's emphatic language in Smith v. Estelle, and its steadfast adherence to the essential principles of Griffin,[13] we believe that Griffin's protections apply equally to the guilt and penalty phases of a death penalty trial.
 
 
 90
 Lesko provided testimony of a biographical nature at the penalty phase of his trial. Clearly, then, he could not claim a fifth amendment privilege against cross-examination or prosecutorial comment on matters reasonably related to his credibility or the subject matter of his testimony. See Harrison v. United States, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968) ("A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives ..."); cf. McGautha v. California, 402 U.S. 183, 217, 91 S.Ct. 1454, 1472, 28 L.Ed.2d 711 (1971) ("[T]he policies of the privilege against compelled self-incrimination are not offended when a defendant in a [non-bifurcated] capital case yields to the pressure to testify on the issue of punishment at the risk of damaging his case on guilt.") Furthermore, it is permissible for the prosecutor or the court to advise the jury that it may draw an adverse inference from the defendant's silence when the defendant has testified as to some facts concerning the crime charged, but has refused to testify as to other facts within his knowledge. See United States v. Weber, 437 F.2d 327, 334 (3d Cir.1970) (citing Caminetti v. United States, 242 U.S. 470, 494, 37 S.Ct. 192, 198, 61 L.Ed. 442 (1917)), cert. denied, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971).
 
 
 91
 However, we do not believe that a defendant's penalty phase testimony about mitigating factors that are wholly collateral to the charges against him operates as a complete waiver of the defendant's self-incrimination privilege or his rights under Griffin. Under these circumstances, we believe that the Griffin rule forbids prosecutorial comment about the defendant's failure to testify concerning the merits of the charges against him.
 
 
 92
 This application of Griffin is consistent with the principle--which was well-established at the time of Lesko's trial, see Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)--that a criminal defendant does not completely waive the fifth amendment privilege by testifying solely on collateral or preliminary matters. See Simmons v. United States, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968) (defendant's testimony at pretrial suppression hearing may not be admitted against him at trial); United States v. Inmon, 568 F.2d 326, 332 (3d Cir.1977) (defendant's testimony on hearing on double jeopardy claim may not be used against defendant at trial); United States v. Branker, 418 F.2d 378, 380 (2d Cir.1969) (defendant's testimony at appointment of counsel hearing may not be admitted against him at trial); cf. United States v. Yurasovich, 580 F.2d 1212, 1218 (3d Cir.1978) (guilty plea constitutes "waiver of Fifth Amendment rights solely with respect to the crime to which the guilty plea pertains."). As in Griffin, the courts in these cases were concerned with maintaining the vitality of the self-incrimination privilege by not imposing a prohibitive cost on its exercise. This concern is especially pronounced in the present context. Without the protection of Griffin, a capital defendant in the penalty phase of his trial could avoid prosecutorial comment about his failure to address the charges against him only at the price of not providing what may be his "life or death" testimony about collateral mitigating circumstances. This is too high a price to require the accused to pay for the maintenance of his fifth amendment privilege.
 
 
 93
 Although counsel has not cited, and our research has not disclosed, any case that precisely addresses this issue, we believe that Calloway v. Wainwright, 409 F.2d 59 (5th Cir.1969), cert. denied, 395 U.S. 909, 89 S.Ct. 1752, 23 L.Ed.2d 222 (1969), is instructive. In that death penalty case, the defendant testified at trial for the limited purpose of challenging the voluntariness of his confession. During closing argument, the prosecutor repeatedly commented on the defendant's failure to testify about the substance of the charges against him. The court rejected the state's contention that the defendant's limited testimony constituted a complete waiver of his fifth amendment privilege against self-incrimination, and held that the prosecutor's comments violated Griffin. The court reasoned that
 
 
 94
 the determination by the jury of the weight to be given to a confession is a collateral issue and such determination does not directly relate to the issue of guilt. Cf. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Under these circumstances the prosecutor cannot draw unfavorable inferences from the failure of the accused to testify on the merits of the accusation.
 
 
 95
 409 F.2d at 65.
 
 
 96
 In contrast to Calloway's testimony about the voluntariness of his confession,[14] Lesko's penalty phase testimony about this childhood, family background, and schooling did not bear even a tangential relationship to the substance of the charges against him.[15] We do not believe that Lesko's limited testimony constituted a waiver of his right under Griffin to be free from prosecutorial comment about his failure to testify about the merits of the prosecution's case.b. Violation of Griffin
 
 
 97
 Having concluded that Lesko retained the protection of the Griffin rule, we must now determine whether the challenged comments violated that rule, or whether, as the appellees assert, the prosecutor's statement was simply an appropriate reference to Lesko's demeanor at trial.
 
 
 98
 Our well-established test for determining whether a prosecutor's remark violates Griffin is " 'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " Bontempo v. Fenton, 692 F.2d 954, 959 (3d Cir.1982) (quoting United States v. Chaney, 446 F.2d 571, 576 (3d Cir.1971)), cert. denied, 460 U.S. 1055, 103 S.Ct. 1506, 75 L.Ed.2d 935 (1983). In making this determination, we must examine the challenged prosecutorial remark in its trial context. United States v. Robinson, 485 U.S. 25, 31-33, 108 S.Ct. 864, 868-70, 99 L.Ed.2d 23 (1988); Lockett v. Ohio, 438 U.S. 586, 595, 98 S.Ct. 2954, 2959, 57 L.Ed.2d 973 (1978).
 
 
 99
 Under this test, the prosecutor's remarks constituted an impermissible comment on Lesko's failure to testify on the merits. The prosecutor asked the jury to consider Lesko's "arrogance" in taking the "witness stand" to present mitigating evidence about his background, without even having the "common decency to say I'm sorry for what I did." The prosecutor then parodied the gist of Lesko's testimony: "I don't want you to put me to death, but I'm not even going to say that I'm sorry." Tr. at 1697. To the jury, the natural and necessary interpretation of these comments would be that Lesko had a moral or legal obligation to address the charges against him--indeed, to apologize for his crimes--during his penalty phase testimony, and that the jury could and should punish him for his failure to do so.
 
 
 100
 We need not reach the broad question of whether, and to what extent, a defendant's demeanor is relevant to the sentencing determination in a death penalty case, because we do not consider that the prosecutor's comments in this case were a simple reference to demeanor. Fairly construed, the prosecutor's remark was a condemnation of Lesko's failure to testify about his role in the events surrounding the Miller homicide. Clearly, such testimony would have been self-incriminating. (It also would have almost certainly contradicted Lesko's steadfast position throughout the trial that he did not intend to kill Officer Miller, but was simply a passive observer to the shooting. See People v. Coleman, 71 Cal.2d 1159, 80 Cal.Rptr. 920, 459 P.2d 248, 254 (1969); Owen v. Texas, 656 S.W.2d 458, 459-60 (Tex.Cr.App.1983) (en banc)).[16] Thus, we conclude that the prosecutor's criticism of Lesko's failure to express remorse penalized the assertion of his fifth amendment privilege against self-incrimination, in violation of the rule in Griffin v. California.[17]
 
 
 101
 2. "Appeal to Vengeance"
 
 
 102
 We believe that the conclusion of the prosecutor's closing argument was improper in two important respects. First, the prosecutor's comments were "directed to passion and prejudice rather than to an understanding of the facts and of the law." United States ex rel. Perry v. Mulligan, 544 F.2d 674, 680 (3d Cir.1976), cert. denied, 430 U.S. 972, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977). Although he could properly counsel the jury to avoid emotional responses that were not rooted in the trial evidence, see California v. Brown, 479 U.S. 538, 542-43, 107 S.Ct. 837, 839-40, 93 L.Ed.2d 934 (1987), and could argue in favor of the purposes of the death penalty, including the objectives of retribution and deterrence, see Gregg v. Georgia, 428 U.S. 153, 183-87, 96 S.Ct. 2909, 2929-32, 49 L.Ed.2d 859 (1976) (Opinion of Stewart, Powell, and Stevens, JJ.), the prosecutor exceeded the bounds of permissible advocacy by imploring the jury to make its death penalty determination in the cruel and malevolent manner shown by the defendants when they tortured and drowned William Nicholls and shot Leonard Miller.
 
 
 103
 In Drake v. Kemp, 762 F.2d 1449, 1458 (11th Cir.1985), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986), the court considered the propriety of a prosecutor's quotations in his closing argument from century-old Georgia Supreme Court opinions that condemned "that sickly sentimentality that springs into action whenever a criminal is at last about to suffer for a crime ..." and "the false humanity that starts and shudders when the axe of justice is ready to strike." The court held that these remarks were improper, explaining that
 
 
 104
 [t]he ultimate power of the jury to impose life [imprisonment], no matter how egregious the crime or dangerous the defendant, is a tribute to the system's recognition of mercy as an acceptable sentencing rationale.... Thus, the suggestion that mercy is inappropriate was not only a misrepresentation of the law, but it withdrew from the jury one of the most central sentencing considerations, the one most likely to tilt the decision in favor of life.
 
 
 105
 Id. at 1460. Although the prosecutor's remarks in Drake were stronger and lengthier than the ones at issue here, the comments in this case were similarly calculated to incite an unreasonable and retaliatory sentencing decision, rather than a decision based on a reasoned moral response to the evidence.
 
 
 106
 Second, the prosecutor's suggestion that the jury had a "duty" to even the "score," which stood at "John Lesko and Michael Travaglia two, Society nothing," invited the jury to impose the death sentence not only for the Miller murder, but also for the Nicholls murder--a crime to which Lesko had already pled guilty, and for which he would be separately sentenced. As the appellees point out, the sentencing jury could properly consider a prior murder conviction as an "aggravating circumstance." 42 Pa.Cons.Stat.Ann. Sec. 9711(d)(10). However, the jury had no authority to impose the death penalty for the Nicholls murder itself. The prosecutor's suggestion that the jury had a "duty" to do so was clearly improper. See Rogers v. Lynaugh, 848 F.2d 606, 611 (5th Cir.1988) (prosecutor's argument that jury's sentence should include punishment for prior felony convictions constituted an "exhortation to assess multiple punishments for the same offense," in violation of the double jeopardy clause of the fifth amendment).
 
 
 107
 On habeas review of prosecutorial comments in state trials, we cannot rest with a determination that the remarks were undesirable or inappropriate, because "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the administration of justice.' " Donnelly v. DeChristoforo, 416 U.S. at 642, 94 S.Ct. at 1871 (quoting Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941)). Instead, "the relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the conviction a denial of due process.' " Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly, 416 U.S. at 643, 94 S.Ct. at 1871). We are not convinced that, considered in isolation, the prosecutor's "appeal to vengeance" would satisfy the stringent standards of Donnelly and Darden. However, for the reasons stated in the next section, we believe that these comments, considered together with the prosecutor's Griffin error, necessitate habeas relief as to the death penalty.
 
 3. Harmless Error
 
 108
 In Chapman, the Supreme Court held that federal constitutional errors in criminal trials that are shown to be harmless beyond a reasonable doubt do not require reversal of the conviction. In Chapman, the inquiry into harmlessness was formulated as "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Id. 386 U.S. at 23, 87 S.Ct. at 827 (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). In reviewing improper prosecutorial comments occurring in the penalty phase of a bifurcated capital case, we will not consider the comments to be harmless unless the state has demonstrated, beyond a reasonable doubt, that the remarks did not change the jury's exercise of discretion in choosing between life imprisonment or death. We shall also consider the Supreme Court's statement that "although not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state-court judgment, the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error." Zant v. Stephens, 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983).
 
 
 109
 Although the death penalty is not an unconstitutionally disproportionate penalty in Lesko's case, see Section II.F., infra, the evidence before the sentencing jury was not so compelling or so overwhelming that we can declare with confidence that the prosecutor's "appeal to vengeance" and his improper reference to Lesko's failure to express remorse did not influence the jury's sentencing decision. Counterbalanced against the prosecution's aggravating evidence was significant mitigating evidence showing, inter alia, that Lesko's participation in the homicide was relatively minor, that he was a young man at the time of the offense, and that he had a deprived and troubled childhood. See 42 Pa.Cons.Stat.Ann. Secs. 9711(e)(4), (e)(7), (e)(8). The jury apparently credited at least some of Lesko's mitigating evidence, as it found that the aggravating circumstances "outweigh[ed]" the mitigating circumstances. Tr. at 1731-32.
 
 
 110
 The trial judge instructed the jury that it should base its penalty decision on the evidence, and not upon considerations of sympathy for either the defendants or the victim. Tr. at 1706. See Section II.E., infra. The judge also instructed the jury that "it is entirely up to a defendant whether to testify, and you must not draw any adverse inference from the fact that a defendant does not testify." Tr. at 1706. However, these instructions were neither immediate, see United States v. Dansker, 537 F.2d 40, 63 (3d Cir.1976) ("immediate cautionary instructions" could "insure[ ] that no juror would misconstrue the prosecutor's statement as an adverse comment on [defendant's] failure to testify"), cert. denied sub nom. Valentine v. United States, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), nor did they specifically address the prosecutor's errors. See United States v. Adamo, 534 F.2d 31, 40 (3d Cir.) (district court instruction sufficient to cure possible ambiguity in prosecutor's remark that allegedly violated Griffin ), cert. denied sub nom. Kearney v. United States, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976). Thus, these instructions did not render the prosecutor's remarks harmless.
 
 
 111
 In sum, given Lesko's mitigating evidence, and considering the prosecutor's Griffin violation and "appeal to vengeance" in context, we conclude that the errors in the prosecutor's closing argument were not harmless.
 
 D. Exclusion of veniremember
 
 112
 Lesko argues that the trial court's exclusion for cause of a veniremember who had expressed her personal opposition to the death penalty violated Witherspoon v. Illinois, 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968), which held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voice general objections to the death penalty or expressed conscientious or religious scruples against its infliction."
 
 
 113
 During her examination by the prosecutor, veniremember Esther Kroh, a seventy four year old woman, denied that she had "any conscientious scruples against imposing the death penalty," and stated that she could vote "either way" if the jury was called upon to determine whether to sentence the defendants to life imprisonment or to death. Jury Selection Transcript at 255-56. At the conclusion of his examination, the prosecutor stated that Ms. Kroh was "acceptable to the prosecution." Id. at 258.
 
 
 114
 Ms. Kroh's views on capital punishment were further probed during her examination by Travaglia's attorney.
 
 
 115
 Q: Well, let me ask this ma'am: as regards the death penalty, should the jury return a verdict against either one or both of these defendants for first degree murder, are your feelings about the death penalty such that if you had to make a decision as to whether to impose the death penalty or impose a sentence of life, simply because the victim in this case was a police officer, would you then irrespective of the other evidence that you heard vote automatically for the death penalty?
 
 
 116
 A: No sir, I'm opposed to the death penalty.
 
 
 117
 COUNSEL: This witness is acceptable to the defendant.
 
 
 118
 THE COURT: Are you saying under all circumstances, that irrespective of what evidence was given to you, because you are opposed to the death penalty, you could not participate in imposing the death penalty upon somebody, irrespective of what evidence was given to you?
 
 
 119
 A: Well, I am opposed, yes.
 
 
 120
 THE COURT: You're opposed to the death penalty?
 
 
 121
 A: Yes sir.
 
 
 122
 Id. at 260-61.
 
 
 123
 After counsel for both defendants stated that Ms. Kroh was acceptable as a juror, the prosecution moved that she be excused for cause, stating that her responses to defense counsel were "directly opposed" to the statements she had made to him. Id. at 261-62. The court granted this motion, ruling that "under the situation as observed and determined by this Court, this juror is not qualified to serve." Id. at 262.
 
 
 124
 The Supreme Court has never retreated from its essential position in Witherspoon that "[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." 391 U.S. at 519, 88 S.Ct. at 1775. See Lockhart v. McCree, 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986) ("[T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law."). Despite certain language in Witherspoon that might have implied a broader standard,[18] however, the Court has held that a trial court may properly excuse a juror for cause if that individual's opposition to capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 421, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The Witt Court believed that this standard was more practical than any bright-line test of juror bias, because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." Id. at 424-25, 105 S.Ct. at 852. The Court also held that a state trial court's determination that a particular veniremember is impermissibly biased against the death penalty is essentially a factual finding that is entitled to a "presumption of correctness" under 28 U.S.C. Sec. 2254(d). Id. at 426-29, 105 S.Ct. at 853-55.
 
 
 125
 Turning to the present case, we conclude that the trial judge did not err in excluding Ms. Kroh for cause. Her statements on voir dire establish a likelihood that her opposition to capital punishment would have substantially impaired her ability to comply with the trial court's sentencing instructions. Although Ms. Kroh initially stated to the prosecutor that she would be willing to vote for the death penalty in a proper case, she later provided an ambiguous response to defense counsel's query about whether "irrespective of the evidence" she would "vote automatically for the death penalty" for a defendant convicted of murdering a police officer. Ms. Kroh then responded affirmatively to the court's inquiry about whether "under all circumstances" and "irrespective of [the] evidence" her opposition to capital punishment would prevent her from participating in a decision to impose the death penalty.
 
 
 126
 Construed reasonably, and with the requisite deference to the trial court's assessment of Ms. Kroh's demeanor, see Witt, 469 U.S. at 434, 105 S.Ct. at 857, this last response was not simply an expression of an abstract conscientious or philosophical objection to capital punishment. See Maxwell v. Bishop, 398 U.S. 262, 264-65, 90 S.Ct. 1578, 1580, 26 L.Ed.2d 221 (1970). Ms. Kroh's response was an affirmation that her personal opposition to the death penalty would prevent her from considering the full range of lawful penalties. In this respect, her comments are indistinguishable from those that the Witt Court found sufficient to justify exclusion from the jury. Id. 469 U.S. at 415-16, 105 S.Ct. at 847-48. Accordingly, we hold that the trial court did not commit reversible error in excluding Ms. Kroh for cause.
 
 E. Anti-sympathy Instruction
 
 127
 Lesko contends that the trial court erred in giving the following instruction to the jury at the conclusion of the penalty phase of his trial.
 
 
 128
 Now, the verdict is for you, members of the jury. Remember and consider all of the evidence, giving it the weight to which you deem it is entitled. Your decision should not be based on sympathy, because sympathy could improperly sway you into one decision--into a decision imposing the death sentence, or could improperly sway you against the decision of imposing the death sentence. There is sympathy on both sides of that issue. Sympathy is not an aggravating circumstance; it is not a mitigating circumstance.
 
 
 129
 Tr. at 1706.
 
 
 130
 Lesko asserts that this "anti-sympathy" instruction impermissibly limited the jury's consideration of the mitigation evidence presented at the penalty trial concerning his childhood and family background, in violation of the holdings of Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), that a sentencing jury in a death penalty case must not be precluded from considering as a mitigating factor any relevant aspect of the defendant's background or record.
 
 
 131
 Although Lesko's argument may be based on a plausible reading of Lockett and Eddings, we cannot consider those opinions on a clean slate. Lesko's challenge is foreclosed by two more recent Supreme Court decisions that have upheld substantially similar anti-sympathy jury instructions.
 
 
 132
 In California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the Court rejected a challenge to an instruction that cautioned the jury not to be swayed "by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling."[19] The Court concluded that even if a juror focused on the judge's instruction to avoid basing the sentencing decision on "mere sympathy," he or she "would likely interpret the phrase as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced in the penalty phase." Id. at 542, 107 S.Ct. at 840.
 
 
 133
 In Saffle v. Parks, --- U.S. ----, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), the Court considered a challenge to an instruction directing the sentencing jury in a capital case to "avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence." Id. 110 S.Ct. at 1259. Like Lesko, Parks argued that the anti-sympathy instruction violated the eighth amendment. However, the Court held that the principle Parks urged could not be applied on federal habeas review, because it was a "new rule" within the meaning of Teague v. Lane that was not dictated by Supreme Court caselaw at the time his conviction became final in 1983.[20] The Court determined that the rationale of Lockett and Eddings did not preclude the trial court from delivering its anti-sympathy instruction, stating that nothing in those decisions
 
 
 134
 prevents the State from attempting to ensure reliability and nonarbitrariness by requiring that the jury consider and give effect to the defendant's mitigating evidence in the form of a "reasoned moral response," rather than an emotional one. The State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice.
 
 
 135
 Parks, 110 S.Ct. at 1262 (citations omitted).
 
 
 136
 Lesko attempts to distinguish Brown and Parks on the basis of differences in the language of the challenged instruction in his case, but these are differences of form, not substance. The essential message of the present instruction is similar to that of the anti-sympathy instructions reviewed by the Supreme Court: that the sentencing determination should not be based solely on the juror's emotional sensitivities, but on their evaluation of the actual evidence concerning the crime and the defendant.[21] Thus, the anti-sympathy instruction in this case passes constitutional muster.
 
 F. Disproportionality
 
 137
 Lesko's defense at trial is that he willingly joined Travaglia and Rutherford on their mission to rob the convenience store, but that he was merely a passive and unwitting observer to Travaglia's shooting of Officer Miller. He was nevertheless convicted of first degree murder and criminal conspiracy to commit murder. Lesko argues that under Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the death sentence is an unconstitutionally disproportionate penalty for his participation in the Miller homicide.
 
 
 138
 In Enmund, the petitioner was sentenced to death following his conviction for a murder committed during the course of a botched robbery. He was not present at the scene of the crime, nor was it shown that he intended to kill the victims. However, the record supported an "inference" that he was in a car at the time of the killings, waiting to help the robbers escape. Id. at 788, 102 S.Ct. at 3371. Under Florida law, this was sufficient to make him "a constructive aider and abettor and hence a principal in first-degree murder upon whom the death penalty could be imposed." Id.
 
 
 139
 The Supreme Court determined that the eighth amendment barred imposition of a death sentence in these circumstances, as the Florida procedure did not ensure that the penalty was reasonably related to the petitioner's "personal responsibility and moral guilt." Id. at 801, 102 S.Ct. at 3378. The Court reasoned that the focus of the sentencing determination "must be on [Enmund's] culpability, not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence,' which means that we must focus on 'relevant facets of the character and record of the individual offender.' " Id. at 798, 102 S.Ct. at 3377 (citations omitted).
 
 
 140
 The Court applied its Enmund holding in Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), which involved a challenge to death sentences imposed upon two brothers who were convicted under Arizona's felony-murder and accomplice liability statutes. The brothers assisted their father and another inmate in an armed prison escape, and then participated in the armed robbery and abduction of a family of four. The father and the other inmate then "brutally murder[ed] their four captives with repeated blasts from their shotguns." The brothers were not present at the immediate scene of the killing, and both testified that they were "surprised" by the shooting. However, neither defendant attempted to help the victims, who were abandoned in the desert. Id. at 141, 107 S.Ct. at 1679.
 
 
 141
 The Supreme Court accepted the petitioners' assertion that there was no evidence showing that they did not " 'intend to kill' as that term has been generally understood in the common law." Id. at 150, 107 S.Ct. at 1684. However, the Court nevertheless concluded that on the facts before it, the death penalty was not an unconstitutionally disproportionate sanction.
 
 
 142
 Enmund held that when "intent to kill" results in its logical though not inevitable consequence--the taking of human life--the Eighth Amendment permits the State to exact the death penalty after a careful weighing of aggravating and mitigating circumstances. Similarly, we hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.
 
 
 143
 Id. at 157-58, 107 S.Ct. at 1688.
 
 
 144
 Although the Tison Court did not attempt to define the "particular types of conduct and states of mind warranting imposition of the death penalty," it held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." Id. at 158, 107 S.Ct. at 1688.
 
 
 145
 We conclude that the evidence of Lesko's personal involvement in the criminal episode culminating in the Miller homicide satisfies both elements of Tison's fact-bound inquiry. The record clearly establishes the first element--"major participation in the felony committed." Like the Tison brothers, and unlike Enmund, Lesko was "actively involved" and "physically present during the entire sequence of criminal activity" culminating in the homicide. Id. at 158, 107 S.Ct. at 1688. His own post-arrest statement establishes that he was a major actor in the plan to rob the Stop-and-Go store, and in the subsidiary plan to lure Officer Miller into a high speed chase. Tr. at 611-12, 614-18. Finally, Lesko was physically present when Travaglia shot Officer Miller and he joined Travaglia and Rutherford in fleeing the scene of the crime.
 
 
 146
 The evidence concerning Lesko's role in the criminal episode surrounding the slaying of Officer Miller also satisfies Tison's second requirement that the defendant act with a "reckless indifference to human life." After the Nicholls murder, Lesko and Travaglia directed Rutherford to obtain the bullets that were later used to kill Officer Miller. In his post-arrest statement to the police, Lesko acknowledged that he and his companions sped past Officer Miller three times, at speeds up to ninety miles per hour, in order to "draw the cop's attention" so that he would be lured into chasing them. The trio hoped to "lose" Officer Miller during a high speed chase so that they could "go and knock off the Stop-N-Go." In their third and final attempt to goad Officer Miller into a pursuit, the men drove directly toward the police car, swerving only when they were "about three feet away from it." Id. at 611-12, 617-18. Rutherford testified that during the car chase, Lesko advised him to "lay down in the back, because it might turn into a shooting gallery." Id. at 371. There was no evidence to suggest that Lesko made any effort to dissuade Travaglia from pointing the gun at Officer Miller, or to aid the officer after the shooting. Lesko later told a friend, Daniel Keith Montgomery, that he also "wanted to" shoot Officer Miller.[22] According to Lesko's post-arrest statement to the police, he and his companions escaped by driving some fifteen miles, and then fleeing on foot. Id. at 612, 618.
 
 
 147
 In our view, Lesko's active and substantial role in planning the armed robbery of the convenience store, his willing participation in the scheme to lure Officer Miller away from the store by means of a dangerous high speed car chase, and his obvious indifference to the risks that this conduct posed to the police officer, combine to establish a level of personal responsibility and moral guilt sufficient to satisfy the constitutional standards set forth in Enmund and Tison.
 
 
 148
 G. Jury discretion to consider voluntary manslaughter charge
 
 
 149
 The trial court instructed the jury on first, second, and third degree murder and voluntary and involuntary manslaughter as to both defendants. The court's voluntary manslaughter charge, which was given at the request of defense counsel, tracked the statutory definition of the offense as a killing without lawful justification committed while the actor is under a sudden and intense passion resulting from serious provocation. 18 Pa.Cons.Stat.Ann. Sec. 2503(a). Although the trial court believed that it was obligated to give the charge regardless of the evidence,[23] the court also reasoned that a voluntary manslaughter charge might be supported on the theory that the Miller homicide "result[ed] from a negligent manner of doing a felonious act in the pointing of a deadly weapon at a police office making an arrest or attempting to make an arrest or stopping an individual...." Tr. at 1172-73.
 
 
 150
 Lesko now complains that the trial court introduced an impermissible level of arbitrariness into the jury's sentencing determination because it delivered a voluntary manslaughter instruction "even though there was no evidence that defendant was guilty of that charge." Appellant's Brief at 45. Citing Commonwealth v. Schaller, 493 Pa. 426, 426 A.2d 1090 (1981); Commonwealth v. Whitfield, 474 Pa. 27, 376 A.2d 617 (1977); and Commonwealth v. Jones, 457 Pa. 563, 319 A.2d 142, cert. denied, 419 U.S. 1000, 95 S.Ct. 316, 42 L.Ed.2d 274 (1974), he asserts that the Pennsylvania Supreme Court has "unequivocally held that every defendant on trial for first degree murder is absolutely entitled upon request to have the lesser included charges of third degree murder and voluntary manslaughter submitted to the jury regardless of the evidence." Appellant's Brief at 45. Lesko contends that this practice violates the plurality decision in Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), which invalidated Louisiana's death penalty statute because, among other defects, the trial court was required to charge on non-capital degrees of murder and manslaughter even if the evidence did not support the lesser verdicts.
 
 
 151
 Contrary to Lesko's characterization of the Pennsylvania law as "unequivocal," recent Pennsylvania decisions have eviscerated the rule enunciated in Commonwealth v. Jones that, regardless of whether the evidence supports such a charge, "a defendant under indictment of murder will be entitled, upon request, to have the jury advised of its power to return a verdict of voluntary manslaughter." 457 Pa. 563, 573-74, 319 A.2d 142, 148 (Pa.1974) (Nix, J., opinion for an equally divided court in support of affirmance) (emphasis in original).[24] However, like the trial court, we will assume that Lesko was entitled, under the governing Pennsylvania caselaw at the time of his trial, to the requested voluntary manslaughter instruction even if the evidence did not support such a charge.
 
 
 152
 We nevertheless conclude that the trial court did not err in granting counsel's request for this instruction. As an initial matter, we agree with the observation of the Pennsylvania Supreme Court that "it would be anomalous to allow a defendant to request instructions on all degrees of homicide and then complain that the practice requires the vacating of his sentence of death because it introduces an element of arbitrariness into the process." Commonwealth v. Frey, 504 Pa. 428, 450, 475 A.2d 700, 711, cert. denied, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). However, assuming arguendo that the trial evidence could not support a voluntary manslaughter verdict, we do not believe that the fact that the court instructed on that offense violates the rationale of Roberts. The principal defect of the capital punishment scheme overturned in Roberts was Louisiana's mandatory death penalty for first degree murder, which prevented the court from considering in its sentencing determination any "mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender." 428 U.S. at 333-34, 96 S.Ct. at 3006. Thus, Louisiana's practice of instructing the jury on all degrees of homicide, regardless of the evidence, plainly invited the jury "to disregard their oaths and choose a verdict for a lesser offense whenever they feel that the death penalty is inappropriate." Id. at 335, 96 S.Ct. at 3007. In the plurality's view, "[t]he Louisiana procedure neither provides standards to channel jury judgments nor permits review to check the arbitrary exercise of the capital jury's de facto sentencing discretion." Id.
 
 
 153
 The former Pennsylvania practice in first degree murder cases of charging on lesser degrees of homicide, regardless of the evidence, is not analogous to the situation addressed in Roberts. Unlike Louisiana's mandatory death penalty law, Pennsylvania's death penalty statute provides adequate standards to guide the sentencing determination, and permits the sentencing jury to "consider and give effect to all mitigating evidence." Blystone v. Pennsylvania, --- U.S. ----, ----, 110 S.Ct. 1078, 1082, 108 L.Ed.2d 255 (1990). See also Zettlemoyer, 923 F.2d at 293 ("[The] unrestricted consideration of mitigating circumstances [under the Pennsylvania death penalty statute] clearly meets the Eighth Amendment's requirements."). Under Pennsylvania's scheme, unlike Louisiana's, a jury considering a first degree murder charge is not likely to return a verdict for an unsupported non-capital charge simply because the circumstances of the crime or the defendant do not warrant the extreme sanction of death. Instead, a Pennsylvania jury is able to return a first degree murder verdict with confidence that it will later have the opportunity to decide whether to impose a death sentence.
 
 
 154
 The non-mandatory nature of the Pennsylvania's death penalty, the jury's ability to consider the full range of mitigating evidence, the standards guiding the jury's sentencing discretion, and the meaningful state appellate review of death penalty cases fully meet the concerns expressed by the Roberts plurality about the potential for arbitrary results arising from an instruction on an unsupported non-capital verdict. Thus, the trial court's voluntary manslaughter instruction was not a constitutional error.
 
 
 155
 H. Defendant's Burden to Establish Mitigating Circumstances by a Preponderance of the Evidence
 
 
 156
 Lesko argues that Pennsylvania's death penalty statute is unconstitutional because it provides that "mitigating circumstances must be proved by the defendant by a preponderance of the evidence." 42 Pa.Cons.Stat.Ann. Sec. 9711(c)(1)(iii). However, the Supreme Court recently considered, and rejected, a similar challenge to Arizona's death penalty statute. In his plurality opinion in Walton v. Arizona, --- U.S. ----, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), Justice White concluded that imposing such a burden on capital defendants does not violate the constitution.
 
 
 157
 So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.
 
 
 158
 Id. 110 S.Ct. at 3055 (citation omitted).[25]
 
 
 159
 Under Pennsylvania's death penalty statute, the Commonwealth is not relieved of its burden to prove every element of the offense and to establish the existence of aggravating circumstances. Furthermore, the statute allows the sentencing jury to evaluate and give effect to the full range of relevant mitigating evidence. Blystone, 110 S.Ct. at 1082. Therefore, we find no constitutional defect in Pennsylvania's requirement that a capital defendant prove mitigating circumstances by a preponderance of the evidence.
 
 I. Admission of Evidence of Nicholls Murder
 
 160
 Lesko asserts that his due process rights were violated by the introduction of evidence at the guilt phase of his trial concerning the "gruesome details" of the Nicholls murder. He argues that this evidence was relevant only to establish "bad character," and not to show intent or motive. However, we have determined this issue adversely to Lesko in our prior decision, in which we held that the evidence of the prior crime was probative of intent and motive, and that it was not unduly prejudicial. We then noted that
 
 
 161
 given the probative value of Rutherford's testimony as to Lesko's motive to kill Officer Miller, and to refute his self-portrayal as a passive observer, we do not find that the prejudicial impact [of the evidence of the Nicholls murder] outweighs its probative value--no less that it does so in a manner so conspicuously as to rise to the level of a constitutional violation.
 
 
 162
 Lesko, 881 F.2d at 55.
 
 
 163
 Because we are bound by the holding of the prior panel opinion,[26] we must decline Lesko's invitation to reexamine this issue.
 
 III. CONCLUSION
 
 164
 Given the lengthy and tortured procedural history of this case, and the emotional responses evoked by capital punishment cases generally and by this case in particular, a brief comment is appropriate on our decision to remand this case for additional proceedings.
 
 
 165
 Whatever views one might have on capital punishment, one must acknowledge that this intermediate appellate court is not the final arbiter of either the legality or morality of the death penalty. So long as this sanction remains in use, one must further concede that no rational purpose is served by drawn out and repetitive litigation that simply delays the ultimate resolution of death penalty matters. However, it also cannot be denied that the very nature of capital punishment demands a scrupulous inquiry into the adequacy of state court evidentiary hearings in death cases. The importance of this inquiry was well stated by the Supreme Court in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).
 
 
 166
 In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. See, e.g., Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different. See Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).
 
 
 167
 Although the condemned prisoner does not enjoy the same presumptions accorded a prisoner who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being.
 
 
 168
 477 U.S. at 411, 106 S.Ct. at 2602 (plurality opinion).
 
 
 169
 For the reasons stated in this opinion, we will reverse the judgment under review to the extent that it sustains the imposition of the death penalty. We will remand to the district court for the holding of an evidentiary hearing on the appellant's claim that his Indiana County guilty plea was not voluntary and for the subsequent issuance of the writ insofar as the death penalty is concerned.
 
 
 170
 We will direct the district court to issue the writ subject to the holding of a state court resentencing proceeding within a reasonable period of time to be set by the district court. If the district court determines, on the basis of the evidentiary hearing described in the last paragraph, that the appellant's Indiana County guilty plea was not voluntary, the writ shall be issued subject to the additional requirement that evidence of the guilty plea not be introduced at the resentencing proceeding.
 
 
 171
 We will affirm the judgment under review to the extent that it sustains the determination of appellant's guilt.
 
 
 
 [1]
 At the later hearing on Lesko's motion to withdraw his guilty plea, the prosecutor testified that "[o]n the day of sentencing Mr. Armstrong approached me and it is my recollection that he asked me if sentencing could be deferred until after the Miller trial in Westmoreland County. I didn't object to that." Record of Proceedings on Motion to Withdraw Guilty Plea (April 28, 1981) at 38
 
 
 [2]
 Under Pennsylvania's death penalty statute, conviction of a federal or state offense, "committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable," is an aggravating circumstance which may support the imposition of the death penalty. 42 Pa.Cons.Stat.Ann. Sec. 9711(d)(10)
 Lesko does not dispute that the victim, Leonard Miller, was a "peace officer ... who was killed in the performance of his duties," 42 Pa.Cons.Stat.Ann. Sec. 9711(d)(1), which was the other aggravating circumstance established by the prosecution.
 
 
 [3]
 The trial court denied a request by Travaglia's attorney to cross-examine Lesko on Travaglia's "condition" during their acquaintance. Tr. at 1663
 
 
 [4]
 Armstrong was ethically barred from testifying, because he was representing Lesko at the time
 
 
 [5]
 In its decision in the direct appeal from the Westmoreland conviction, the Pennsylvania Supreme Court ruled that Armstrong's opinion as to the legal effect of the sentencing delay was incorrect. Travaglia, 502 Pa. at 495-98, 467 A.2d at 298-300
 
 
 [6]
 See Lesko, 881 F.2d at 68 n. 11 (Cowen, J., dissenting) (excerpting transcript of Westmoreland County PCHA hearing)
 
 
 [7]
 We conclude that in his direct and PCHA proceedings, Lesko exhausted his state court remedies for his present guilty plea claim
 
 
 [8]
 To clarify the record before us, we directed the appellant to submit an affidavit from Armstrong detailing his plea negotiations with the Indiana County prosecutor and his conversations with the appellant about the plea terms with Lesko. In the affidavit, Armstrong averred that in a May 19, 1980 meeting with the prosecutor (conducted in the presence of the President Judge of Indiana County, counsel for Travaglia, and others) he secured the prosecutor's agreement that Lesko "would plead guilty to 2nd degree murder with the understanding that the guilty plea in Indiana County would not be used in his Westmoreland County trial." Armstrong Affidavit at pp 1-5. Armstrong also stated:
 
 
 [6]
 Initially, one of the participants suggested that the way to implement the agreement was to defer the plea in the Indiana County case until after the trial in Westmoreland County
 
 
 [7]
 In response to this suggestion, someone expressed a concern about the time element, especially in view of the requirements of Rule 1100. [Pennsylvania's speedy trial provision]. They said deferring the plea was not desirable
 
 
 [8]
 After this suggestion, somebody said the way to implement the agreement of non-use was to have Lesko plead guilty now and defer sentencing until after the Westmoreland County trial had taken place. This was agreed to in chambers
 
 
 [9]
 The entry of the plea was assigned to Judge Earley. To the best of my recollection, Judge Earley was either present at the pretrial conference or advised of the agreement before the plea was entered. Given the extensive discussion regarding the point and purpose of the plea agreement which had transpired in the chambers of Judge Handler, the plea colloquy before Judge Earley was very brief. As the record of the colloquy indicates, I merely indicated that the agreement included the provision designed to implement the non-use agreement by stating that "the sentencing would be passed in late June." At the time, June was the expected trial date for the Westmoreland County case
 
 
 [11]
 I spoke to Lesko about the plea agreement on May 19, 1980. I told him that in exchange for a plea to second degree murder, the District Attorney would nolle pros the three (3) other criminal charges against him pending in Indiana County and that the Indiana County guilty plea would not be introduced at the subsequent Westmoreland County trial
 
 
 [12]
 Lesko understood the plea agreement set forth above and he agreed to plead guilty only on that basis
 We recognize that this affidavit was not part of the record before the district court or state court. We cite it only for the purpose of clarifying Armstrong's already stated allegations regarding the circumstances surrounding the plea agreement.
 
 
 [9]
 However, we agree with Judge Cowen's observation in his prior dissent that under Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), if Lesko relied on his attorney's faulty analysis of Pennsylvania law regarding whether a deferred sentence would count as a conviction--rather than his attorney's alleged representation about a non-use agreement with the prosecutor--his "reliance would be insufficient to render a guilty plea invalid on collateral attack." Lesko, 881 F.2d at 71 (Cowen, J., dissenting)
 
 
 [10]
 Of course, such a hearing will not be necessary if, on remand, the Commonwealth represents to the district court that it will not introduce evidence of Lesko's Indiana County guilty plea at the resentencing proceeding in this case
 
 
 [11]
 Lesko was twenty one years old at the time of the Miller homicide. Tr. at 1670
 
 
 [12]
 Defense counsel objected to both of the above quoted comments. Tr. at 1718-21, 1723
 
 
 [13]
 See, e.g., United States v. Hasting, 461 U.S. 499, 507, 103 S.Ct. 1974, 1979, 76 L.Ed.2d 96 (1983) (Griffin "interpreted the Fifth Amendment guarantee against self-incrimination to mean that comment on the failure to testify was an unconstitutional burden on the basic right"); Jenkins v. Anderson, 447 U.S. 231, 235, 100 S.Ct. 2124, 2127, 65 L.Ed.2d 86 (1980) (Griffin "prevents the prosecution from commenting on the silence of a defendant who asserts the right" not to testify); Mackey v. United States, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) ("Griffin ... construed the Fifth Amendment to forbid comment on defendants' failure to testify, thereby removing a burden from the exercise of the privilege against compulsory self-incrimination and further implementing its purpose")
 
 
 [14]
 The Calloway court noted that "[b]efore taking the stand appellant's attorney announced to the Court that appellant was testifying only as to the manner in which the confession was obtained. During the course of his testimony appellant stated at least three times 'I didn't do it.' " 409 F.2d at 64
 
 
 [15]
 Compare Tucker v. Francis, 723 F.2d 1504 (11th Cir.), vacated for reh'g en banc, 728 F.2d 1358 (1984), reinstated in relevant part, 762 F.2d 1496 (1985) (en banc), cert. denied, 478 U.S. 1022, 106 S.Ct. 3340, 92 L.Ed.2d 743 (1986). The Tucker court held that because defendant had testified on the merits of charges against him during the penalty phase, prosecutorial comment on defendant's failure to testify during guilt phase was permissible. However, the court stated that under Calloway, "[h]ad the appellant limited his presentence testimony to biographical mitigating factors this case might be susceptible of a 'collateral matter' or partial waiver limitation." 723 F.2d at 1514 (emphasis added)
 
 
 [16]
 While not directly analogous, Coleman and Owen are instructive, as both of those death penalty cases involve defendants whose trial testimony at the guilt phase was followed by prosecutorial comments at the penalty phase condemning the defendants' lack of remorse
 The defendant in Coleman had testified at the guilt phase of his trial to deny that he planned or participated in the events leading up to the homicide. In his closing argument during the penalty phase, the prosecutor criticized Coleman's failure to admit guilt and show remorse. The California Supreme Court, per Chief Justice Traynor, held that the prosecutor's comments were improper. The court stated that although the sentencing jury "may properly consider the defendant's remorse or lack thereof in fixing the penalty," not "every inference bearing on the question of remorse may be urged upon the jury by counsel."
 A defendant would be placed in an intolerable dilemma if his failure to confess following conviction could be urged at the trial on the issue of penalty as evidence of lack of remorse. To silence such argument, a defendant who had denied his guilt at the trial on the issue of guilt would have to admit or commit perjury at the trial on the issue of penalty, and he could do neither without in effect forfeiting his right to urge the trial court on motion for a new trial to reweigh the evidence on the issue of guilt. We conclude that any argument that failure to confess should be deemed evidence of lack of remorse is not permissible.
 
 
 [80]
 Cal.Rptr. at 920, 459 P.2d at 254
 In Owen, the defendant, who testified in the guilt phase of his homicide trial in support of his theory of self-defense, was found guilty of voluntary manslaughter. He did not testify during the subsequent penalty phase of the trial. In his closing argument at the penalty phase, the prosecutor twice condemned the defendant's failure to say he was "sorry" for his crime.
 On appeal, the court rejected the state's contention that because Owen had testified at the guilt phase, the prosecutor could properly comment on the appellant's failure to express remorse. The court observed that "[a]cceptance of the state's argument would place an accused in the paradoxical position of saying I am sorry for a crime of which I am not guilty." 656 S.W.2d at 459-60.
 
 
 [17]
 We do not believe that the challenged remarks constitute a "fair response" to a claim made by Lesko or his counsel, see United States v. Robinson, 485 U.S. 25, 31-33, 108 S.Ct. 864, 868-70, 99 L.Ed.2d 23 (1988), as we see nothing in Lesko's testimony or in his attorney's closing argument that invited prosecutorial comment on Lesko's failure to address the charges against him
 
 
 [18]
 The Witherspoon Court stated that "[u]nless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that is his position." 391 U.S. at n. 9, 88 S.Ct. at 1773 n. 9. The Court also noted that its holding did not apply when "the only veniremen who were in fact excluded were those who made unmistakably clear ... that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial in the case before them ..." Id. at 522 n. 21, 88 S.Ct. at 1777 n. 21
 
 
 [19]
 As we observed in our last opinion in this case, the jury instruction in Brown was "very similar to the one given the Lesko jury." Lesko, 881 F.2d at 49 n. 6
 
 
 [20]
 Lesko is similarly situated, as his conviction became final for purposes of Teague v. Lane on June 18, 1984, when the Supreme Court denied his certiorari petition in his direct appeal of his Westmoreland County conviction. 467 U.S. 1256, 104 S.Ct. 3547. This date is after the issuance of the Supreme Court's decisions in Lockett and Eddings, and before its decision in Brown
 
 
 [21]
 Lesko points out that Justice O'Connor, whose vote was necessary to establish the five justice majority in Brown stated in her concurring opinion that, on remand, the state court should "determine whether the jury instructions, taken as a whole, and considered in combination with the prosecutor's closing argument, adequately informed the jury of its responsibility to consider all of the mitigating evidence introduced by the respondent." 479 U.S. at 546, 107 S.Ct. at 841-42 (O'Connor, J., concurring)
 Assuming arguendo that Justice O'Connor's concurrence limited the Brown holding, we believe that the jury instructions, taken as a whole, meet the concern expressed in her concurrence. The trial judge instructed the jury to consider all relevant statutory mitigating circumstances, including the catch-all factor of 42 Pa.Cons.Stat.Ann. Sec. 9711(e)(8)--"any other mitigating matter concerning the character or record of the defendant or the circumstances of his offense." Tr. at 1704. The judge later instructed the jury to "[r]emember and consider all of the evidence, giving it the weight you deem it is entitled." Tr. at 1706.
 
 
 [22]
 Montgomery testified that Travaglia and Lesko met with him in a hotel room to discuss the Miller homicide. The prosecutor elicited the following testimony from Montgomery concerning Lesko's statements
 Q: All right now, when the three of you were in the room seated, what happened?
 A: Michael Travaglia looked at me and said, Goddam, or Jesus Christ, I shot a cop.
 Q: And John Lesko was present?
 A: Yes, sir.
 Q: And did he say anything?
 A: Yes, sir.
 Q: What did he say?
 A: He said, I wanted to.
 Q: I wanted to.
 A: Yes.
 Q: Did he say or do anything else?
 A: Just kind of snickered like.
 Q: He what?
 A: Kind of snickered like.
 Q: Laughed?
 A: Ha ha, or something like that.
 Tr. at 481-82.
 
 
 [23]
 In an in-chambers conference with counsel, the trial judge stated: "I have some difficulty in finding how voluntary manslaughter gets in the case; but the rules are that if I am requested to charge on voluntary manslaughter, I will do it." Tr. at 1146
 
 
 [24]
 See Commonwealth v. Frey, 504 Pa. 428, 450 n. 10, 475 A.2d 700, 711 n. 10 (citing recent opinions to show that the Jones rule has "little or no vitality"), cert. denied, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984); Commonwealth v. Carter, 502 Pa. 433, 466 A.2d 1328 (1983) (trial court required to charge on "unreasonable belief" subclass of voluntary manslaughter offense only when the evidence would support such a verdict); Commonwealth v. Zettlemoyer, 500 Pa. 16, 73, 454 A.2d 937, 964-67 (1982) (noting the "erosion" of the Jones rule and stating that "any lingering notion that the Jones rule had constitutional underpinnings has been finally dispelled"), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); Commonwealth v. White, 490 Pa. 179, 185, 415 A.2d 399, 402 (1980) (trial court required to charge on involuntary manslaughter only "when the trial evidence reasonably would support such a verdict"); Commonwealth v. Scaramuzzino, 485 Pa. 513, 517, 403 A.2d 82, 84 (1979) (trial court instruction on voluntary manslaughter may include a statement of opinion that there is no evidence to support such a verdict); Commonwealth v. Haynes, 395 Pa.Super. 322, 577 A.2d 564, 574 (1990) ("[I]t is now clear that Commonwealth v. Jones, ... [is] no longer valid."); see also Hopper v. Evans, 456 U.S. 605, 611, 102 S.Ct. 2049, 2052, 72 L.Ed.2d 367 (1982) ("due process requires that a lesser included offense instruction be given [in a capital case] only when the evidence warrants such an instruction")
 
 
 [25]
 In his Walton concurrence, Justice Scalia stated that because of the "irreconcilable conflicts" in the Supreme Court's jurisprudence on death penalty sentencing, he "will not, in this case or in the future, vote to uphold an Eighth Amendment claim that the sentencer's discretion has been unlawfully restricted." 110 S.Ct. at 3068 (Scalia, J., concurring). Thus, Justice Scalia's concurrence provided the fifth and decisive vote for the more limited plurality holding
 
 
 [26]
 Internal Operating Procedures of the United States Court of Appeals for the Third Circuit, Chapter 9.1