[Crim. No. 12369. In Bank. Oct. 3, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. OTIS RONALD COLEMAN, Defendant and Appellant.

[Crim. No. 13437. In Bank. Oct. 3, 1969.]

In re OTIS RONALD COLEMAN on Habeas Corpus.

Gerald Z. Marer, under appointment by the Supreme Court, Keogh & Marer and Keogh & Lundgren for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci, John T. Murphy and Horace Wheatley, Deputy Attorneys General, for Plaintiff and Respondent.

TRAYNOR, C. J.—A jury found defendant guilty of the first degree murder of Vincent Sulezich and fixed the penalty at death. The trial court denied a motion for a new trial or to reduce the penalty to life imprisonment and entered judgment on the verdict. This appeal is automatic. (Pen. Code, § 1239, subd. (b).) We also have before us a petition for habeas corpus challenging the judgment.

Vincent Sulezich operated a cocktail bar in Newark, California. He borrowed money every week from a bank to cash paychecks of his customers, and it was "common gossip" that he carried large amounts of money on his person. He was fatally shot and robbed when he returned to his home in Oakland after work about 3:30 a.m. on Sunday, November 20, 1966. A witness who was in a nearby apartment heard the gunshots, went to the window, and saw two persons run to a car in the street and drive off.

In February 1967, more than two months after the crime was committed, James Stevenson went to the Oakland police station and confessed to being one of the participants. He named defendant as the other. He pleaded guilty to first degree murder and was sentenced to prison for life. Thereafter he testified against defendant at defendant's trial.

Stevenson testified that he had known defendant for from six to eight weeks before the crime was committed and that he had been with him many times in bars in the Newark area. They discussed the gossip that Mr. Sulezich carried large sums of money and developed a plan to rob him when he returned home from work. Their first attempt failed, and they returned the next night when the crime was committed. They went in Stevenson's car.

Stevenson testified that he did not have a weapon and did not know that defendant had a gun until they parked near the Sulezich home to wait for Mr. Sulezich to return. When

they got out of the car Stevenson saw that defendant had a gun, and defendant said, "don't worry about the gun, it will just scare the hell out of him." After. waiting under a tree for about 45 to 60 minutes, they saw Mr. Sulezich's car approaching, and defendant ran toward the house while Stevenson stayed under the tree. Mr. Sulezich drove into the garage, got out of his car, and walked back onto the driveway. Defendant appeared behind Mr. Sulezich and either knocked or pushed him down. Stevenson saw a flash and heard two shots. He began running to his car and after five seconds he heard a third shot. Defendant returned to the car and told Stevenson to drive away without turning on the headlights.

Stevenson testified that he and defendant returned to defendant's home where they divided the loot, about $1,100. En route defendant had thrown away the gun, a gun clip, bullets, and a wallet. They stayed at defendant's home for about two hours, and defendant took a shower and changed his clothes because the clothes he had been wearing were bloody. They then drove to Niles Canyon and threw the bloody clothes in a creek. About 7 a.m. they went to a bar in Newark. Stevenson and his wife both testified that later in the morning Stevenson's wife, who had been looking for him to tell him he could not come home, came to the bar and confronted Stevenson. Defendant said to her, "now Brenda, don't be mad at Jim. He hasn't done anything wrong. He's been with me all night."

Later in the day Stevenson drove defendant to San Jose and thereafter to the San Francisco airport. Defendant flew to Baltimore and then went to Virginia where he stayed in various places until his arrest in February. There was evidence that he had several hundred dollars while he was in Virginia.

Police officers found the gun where Stevenson told them defendant had abandoned it. There was ballistic evidence that the bullets found at the scene of the crime had been fired from that gun. There was also evidence that defendant bought the gun and had it in his possession before the crime was committed.

Defendant testified in his own defense. He denied participating with Stevenson in any way in planning or committing the robbery and murder. He testified that he sold his gun to Stevenson about a week before the crime was committed, and that he saw it in the glove compartment of Stevenson's car a few days earlier.

Defendant testified that he first met Stevenson in October 1966 after defendant lost his job and that he was with Stevenson from 10 to 15 times, usually at bars, until he left for Virginia. A few days before the crime was committed defendant decided to return to Virginia, where he had formerly lived, because he was out of work and unable to support his family and had heard that if he left home his wife could recieve welfare support for herself and the children. Defendant arranged for Stevenson to pick him up on Sunday, November 20, 1966, the day of the crime. They were to leave defendant's home about 8 a.m. and Stevenson was to drive him to Highway 101 in San Jose so that defendant could hitchhike east.

Defendant testified that on Saturday evening he was with Stevenson, another friend, and his brother-in-law at a bar in Newark. About midnight defendant, his brother-in-law, and Stevenson went to another bar where defendant and his brother-in-law had a drink. Stevenson stayed outside and met a friend whose name defendant did not remember. Defendant's brother-in-law took him home shortly before 1 a.m., and defendant stayed at home the rest of the night and did not see Stevenson again until the next morning. Stevenson arrived around 6 or 7 a.m. and took defendant to the bar where later in the morning defendant sought to placate Stevenson's wife by telling her that he had been with Stevenson all night. Thereafter Stevenson drove defendant to San Jose and then to the airport and lent him money for plane fare and the trip to Virginia. Defendant and a defense witness testified that defendant won by gambling the several hundred dollars that he had in Virginia.

██ Defendant contends that it was prejudicial error to admit into evidence a hearsay statement of witness Hood that defendant had approached Hood in jail and asked him to secure Stevenson's signature on a piece of paper so that defendant could fabricate a sales slip for the murder weapon. We agree with this contention.

Defendant testified that when he sold the murder weapon to Stevenson about a week before the crime was committed, he did not request or receive a receipt for the sale. On cross-examination he denied that he ever attempted to procure Stevenson's signature for the purpose of making a false receipt as evidence of the alleged sale of the gun. In rebuttal the prosecution called Hood, who had been an inmate in the same jail with defendant and Stevenson before defendant's trial.

Hood testified that he had never seen defendant before he saw him at the trial. Hood also stated that a police officer, Inspector Hughes, had tried to get him to agree that defendant had asked him to procure Stevenson's signature but that he had told Inspector Hughes that no such request was made of him.

Inspector Hughes was then called and testified over objection to a conversation that he had with Hood in which Hood stated that defendant had asked Hood to secure Stevenson's signature on a piece of paper that could be used to create a false sales slip for the gun to be predated before the Sulezich murder.

Since Hood's prior statement was used to prove the truth of the matter therein asserted, defendant's constitutional right to confront the witness against him was violated. (U.S. Const., 6th and 14th Amends.; *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111]; *People* v. *Green* (1969) 70 Cal.2d 654 [75 Cal.Rptr. 782, 451 P.2d 422]; *People* v. *Odom* (1969) 71 Cal.2d 709, 713-716 [78 Cal.Rptr. 873, 456 P.2d 145].) As in *Odom*, the trial in this case occurred after the effective date of the Evidence Code permitting such use (Evid. Code, § 1235) and before the decision of this court in the *Johnson* case holding section 1235 unconstitutional as applied against a defendant in a criminal case. The jury was not instructed that the prior statment could be considered only to impeach Hood's testimony. Moreover, the prosecuting attorney forcefully argued that Hughes' testimony setting forth Hood's statement was evidence that Hood's conversation with defendant occurred.

It must also be noted that the error was not limited to the failure to restrict the jury's consideration of Hood's statement to impeachment of Hood's testimony. That statement was not admissible at all, for its probative value to impeach Hood's testimony was obviously ''substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice.'' (Evid. Code, § 352.) Hood's testimony that he had not seen defendant before he saw him at the trial and that defendant had not asked him to secure Stevenson's signature detracted not at all from the prosecution's case before the jury. At most the prosecution was denied advantageous testimony that it may have hoped to elicit, even though it knew before it put Hood on the stand that he would not testify as the prosecution wished. Accordingly, proof that Hood was a liar was of benefit to the prosecution only if the jury were to believe the truth of Hood's

prior statement. The prosecution, however, was not entitled to that benefit, and the risk that it might improperly secure that benefit by impeaching Hood far outweighed any legitimate interest the prosecution had in such impeachment.

The error in permitting the jury to consider Hood's statement as evidence of the truth of the matters contained therein was a violation of defendant's constitutional rights and compels reversal, for we are not convinced beyond a reasonable doubt that the error was harmless. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824]; *People* v. *Odom, supra,* 71 Cal.2d 709, 717.)

The jury was confronted with a direct conflict between Stevenson's testimony and defendant's testimony as to defendant's participation in the crime, and it is impossible to determine how the jury would have resolved that conflict had it not had before it inadmissible hearsay evidence that defendant attempted to fabricate a false sales slip to dissociate himself from the murder weapon. Not only did the erroneously admitted evidence strike at a key element in defendant's case, it could well have been devastating to defendant's credibility. It is therefore reasonably possible that it contributed to the result. (*Chapman* v. *California, supra,* 386 U.S. 18, 24; *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 86-87 [11 L.Ed.2d 171, 172-173, 84 S.Ct. 229]; see also *Harrington* v. *California* (1969) 395 U.S. 250, 254 [23 L.Ed.2d 284, 287-288, 89 S.Ct. 1726, 1728].)

We now turn to contentions that may arise on retrial.

 Defendant contends that it was error to admit evidence that Stevenson had made statements to his father and wife that were consistent with his testimony at the trial. These statements were made before Stevenson turned himself in to the police. They were admitted in evidence in rebuttal after Stevenson had testified on cross-examination that he turned himself in, pleaded guilty, and received a life sentence and after defendant had testified that he had not been with Stevenson at the time of the crime and characterized Stevenson's testimony implicating defendant as lies. Over objection, the trial court admitted the statements under section 791 of the Evidence Code, which provides: "Evidence of a statement made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: . . . (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive,

and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Although defendant made no charge of recent fabrication or bias and no express charge of other improper motive, we agree with the Attorney General's contention that defendant's testimony that Stevenson was lying was an implied charge that Stevenson had confessed to a lesser role in the crime and named defendant as the killer for the improper motive of falsely placing the major blame on defendant so that Stevenson might not receive the death penalty. To establish the admissibility of the prior consistent statements under subdivision (b) of section 791, however, it was also incumbent on the prosecution to show that the statements were made before the improper motive "is alleged to have arisen." Since defendant did not expressly allege any improper motive, he did not expressly allege when any such motive may have arisen. By implication, however, defendant alleged that it arose when Stevenson decided to protect himself at defendant's expense. There is no reason to believe that such improper motive, if any, did not arise before Stevenson decided to confess his involvement in the crime to his father and his wife. Indeed, it is entirely consistent with defendant's implied charge of improper motive that it arose immediately after the murder, when Stevenson realized the predicament he was in, or after he had reflected on the likelihood that he would be caught but that perhaps defendant would not be, or even before the murder was committed, if, as defendant implied, Stevenson was with another person when the crime was committed and knew that defendant would be leaving the state on the following day. Accordingly, the prosecution did not show that when Stevenson implicated defendant in his statements to his father and his wife, the alleged improper motive had not already arisen. It was therefore error to admit the prior consistent statements into evidence.[1]

---

[1] *People* v. *Duvall* (1968) 262 Cal.App.2d 417 [68 Cal.Rptr. 708], is not to the contrary. In that case the implied charge of improper motive referred to a specific time, namely, when the accomplice-witnesses were impliedly charged with making a "deal" with the district attorney. Prior consistent statements made before that time were therefore properly admitted. In the present case, however, there was no implied charge that Stevenson's improper motive arose out of a "deal" with the prosecution and therefore arose at the time such a "deal" was made. The implication was that he approached the police with an already concocted story that cast himself in the best possible light.

■ Defendant contends that the prosecuting attorney committed misconduct by commenting on the failure of defendant's wife to testify on his behalf. We do not agree with this contention.

Before the enactment of the Evidence Code it was misconduct for the prosecuting attorney to comment on the failure of a defendant's spouse to testify for the defendant. (*People* v. *Wilkes* (1955) 44 Cal.2d 679, 687 [284 P.2d 481], and cases cited.) At that time, however, neither spouse could testify for or against the other without the consent of both. (Code Civ. Proc., § 1881, subd. 1; Pen. Code, § 1322; both repealed effective Jan. 1, 1967.) Accordingly, it was improper to comment on the defendant's spouse's failure to testify, for the defendant could not compel his spouse to testify either for or against him. Under the provisions of the Evidence Code, however, a defendant's spouse has no privilege not to testify *for* the defendant, and the defendant has no privilege to prevent his spouse from testifying for or against him. (Evid. Code, §§ 911, 970, 971.) Comment on a wife's failure to testify for her defendant husband does not, therefore, constitute comment on the exercise of a privilege that defendant has (see Evid. Code, § 913) or on his failure to call a witness that he cannot compel to testify on his behalf. Since defendant's failure to call his wife was a failure to call a material and important witness, his not doing so could be considered by the jury and commented upon by the prosecuting attorney. (See Evid. Code, § 412; *People* v. *Carter* (1953) 116 Cal. App.2d 533, 539 [253 P.2d 1016].)

■ Defendant contends that at the trial on the issue of penalty, the trial court erred in refusing to allow the pastor of the church defendant attended while he was a teenager to testify as to his opinion of defendant's potential for rehabilitation. Although the pastor of the defendant's church will frequently be qualified to give an opinion with respect to the defendant's potential for rehabilitation, it is for the trial court to determine whether in a particular case, the pastor's opportunities to know and observe the defendant were sufficient to provide a basis for a meaningful opinion. In the present case, defendant had not been a member of the witness' congregation for over ten years before the trial. Accordingly, the trial court did not abuse its discretion in refusing to allow the witness to state his opinion. (See *People* v. *Davis* (1965) 62 Cal.2d 791, 801 [44 Cal.Rptr. 454, 402 P.2d 142].)

 Defendant contends that at the trial on the issue of penalty, the trial court erred in admitting evidence that defendant had engaged in fist fights and in failing to instruct that the jury must believe beyond a reasonable doubt that the fights occurred before it could consider them. Evidence that defendant engaged in fist fights, however, was admissible as part of his background and history (Pen. Code, § 190.1), and since the trial court instructed the jury that such evidence was "not evidence of any specific crime or crimes," a reasonable doubt instruction with respect thereto was not required.

 Defendant contends that at the trial on the issue of penalty, the prosecuting attorney committed misconduct by arguing that defendant's refusal to admit his guilt demonstrated his lack of remorse. The prosecuting attorney stated: "There he sits. A murderer. A robber-murderer. Remorse? Where is the remorse? . . . A man who, to this very day, will not get on that stand and admit what he has done. . . . You are dealing with a cunning individual, a man who refuses, up to this very minute I am talking to you now, to admit his guilt; . . . a care-less individual."

 The jury may properly consider the defendant's remorse or lack thereof in fixing the penalty. Evidence on that issue is therefore admissible, and counsel may comment thereon. (*People* v. *Talbot* (1966) 64 Cal.2d 691, 712 [51 Cal.Rptr. 417, 414 P.2d 633].) It does not follow, however, that every inference bearing on the question of remorse may be urged upon the jury by counsel. It is fundamentally unfair to urge, as was done here, that a defendant's failure to confess his guilt after he has been found guilty demonstrates his lack of remorse and that therefore such failure should be considered as a ground for imposing the death penalty. Even after he has been found guilty, a defendant is under no obligation to confess, and he has a right to urge his possible innocence to the jury as a factor in mitigation of penalty. (*People* v. *Terry* (1964) 61 Cal.2d 137, 145-147 [37 Cal.Rptr. 605, 390 P.2d 381].) A defendant would be placed in an intolerable dilemma if his failure to confess following conviction could be urged at the trial on the issue of penalty as evidence of lack of remorse. To silence such argument, a defendant who had denied his guilt at the trial on the issue of guilt would have to admit or commit perjury at the trial on the issue of penalty, and he could do neither without in effect forfeiting his right to urge the trial court on motion for new trial to reweigh the evidence on the issue

of guilt. We conclude that any argument that failure to confess should be deemed evidence of lack of remorse is not permissible.

By petition for a writ of habeas corpus filed while this appeal was pending, defendant contends that it was error to admit evidence that he had been convicted of burglary in Virginia, on the ground that he was denied effective representation of counsel in the Virginia proceedings. Since defendant did not challenge the validity of his prior conviction at the trial, there is nothing in the record on appeal to support defendant's contention. We issued an order to show cause in the habeas corpus proceeding, however, so that we could determine, if necessary, whether the evidence of the prior conviction vitiated the judgment before us on the automatic appeal. Since the judgment must be reversed on other grounds, the validity of the prior conviction can be determined on retrial in accord with the procedure set forth in *People* v. *Coffey* (1967) 67 Cal.2d 204, 217-218 [60 Cal. Rptr. 457, 430 P.2d 15]. Accordingly, our order to show cause will be discharged.

The judgment in Crim. No. 12369 is reversed.

The order to show cause in Crim. No. 13437 is discharged, and the petition for a writ of habeas corpus is denied.

Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent from that part of the opinion that reverses the judgment in Crim. No. 12369, and would affirm the judgment.

I concur with that part of the opinion discharging the order to show cause in Crim. No. 13437 and denying the petition for a writ of habeas corpus.