Filed 7/8/15  P. v. Kong CA1/4

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>KENNY KONG,<br><br>     Defendant and Appellant. | A139905<br><br>(San Mateo County<br>Super. Ct. No. SC074510A) |

THE COURT:

The written opinion filed on June 18, 2015 is modified as follows:

In the first full paragraph on page 12 of the opinion, the sentence that reads, "As the Attorney General explains, however, defendant has not cited any federal case in which the court's consideration of defendant's lack of remorse in denying probation was found to violate the Fifth Amendment," is modified by adding a new footnote at the end of that sentence reading:

In a petition for rehearing, defendant, relying on *Minnesota v. Murphy* (1984) 465 U.S. 420 (*Murphy*), contends that the Fifth Amendment protected him from being compelled to make admissions in order to secure a favorable probation decision.  In *Murphy*, the court held that the Fifth Amendment right against self-incrimination not only protects an individual against being involuntarily called as a witness against himself at a criminal trial in which he is a defendant, but also " 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings . . . unless and until he is protected at least against the use of his compelled answers. . . .' " (*Murphy*, *supra*, at p. 426, quoting *Lefkowitz v. Turley* (1973) 414 U.S. 70, 77.)  A person does not lose his Fifth Amendment rights simply because he has been convicted of a crime.  Even where a person is imprisoned or on probation, if the state compels him to make incriminating statements that could be used in a prosecution against him for a crime other than for

1

which he has been convicted, his Fifth Amendment rights have been violated. (*Murphy*, *supra*, 465 U.S. at p. 426.) Because the defendant in *Murphy* voluntarily told his probation officer about his crimes, he could not invoke his Fifth Amendment privilege to prevent the information from being used against him in a subsequent criminal prosecution. (*Id.* at p. 428–429.)

Here, defendant asserts that an expression of remorse would have exposed him to criminal charges for the Valleywood grow operation. Nothing in the record supports his claim that he could have been so charged. At sentencing, the court was concerned simply with whether defendant was remorseful, a factor that bore on the court's decision to grant or deny probation.

This modification does not effect a change in the judgment.

Dated: _____                    _____, P. J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>KENNY KONG,<br><br>     Defendant and Appellant. | A139905<br><br>(San Mateo County<br>Super. Ct. No. SC074510A) |

Kenny Kong appeals from a judgment upon a jury verdict finding him guilty of possession of marijuana for sale (Health & Saf. Code, § 11359), cultivating marijuana (Health & Saf. Code, § 11358), and theft of utility services exceeding $950 in value (Pen. Code, § 498, subd. (d)).  The jury also found true the allegation that the value of utility services taken exceeded more than $65,000 within the meaning of Penal Code section 12022.6, subdivision (a)(1).  Defendant contends that the trial court violated his Fifth Amendment right against self-incrimination when it declined to grant him probation because he refused to express remorse and accept responsibility for his offenses.  He also argues that the restitution award must be reversed because it violated his Sixth Amendment right to a jury trial.  We affirm.

## I.  FACTS

### A.  The Exeter House

The parties stipulated that the house at 3651 Exeter in San Bruno was purchased by Leo Chang on May 15, 2005.  The property was sold in a foreclosure sale at a public auction on April 6, 2011.  On April 12, 2011, Manhattan Real Estate, acting for the new

1

owner, hired a contractor to install new locks on the security gate and the front door. In the course of changing the locks, the contractor went inside the residence and observed marijuana plants growing there. He reported his observations to Manhattan Real Estate, which in turn called the police.

Officer Plank, a member of the San Mateo County Narcotics Task Force, testified that he investigated the call on April 12, 2011, and responded to the Exeter Street house at about 8:00 p.m. Upon arrival, he noticed that the windows on the front of the house were covered with curtains or blinds that prevented any view into the house and potentially blocked any type of light from coming in or out. In Plank's experience, the windows in a house that has an indoor marijuana grow operation are typically covered with drywall or thick, heavy plastic material to prevent anyone from seeing inside the house and also to regulate the light on the plants growing inside the house. Plank also heard a humming sound coming from the inside of the house. Plank found this significant because an indoor grow operation requires a large amount of equipment including fans, pumps, and 1,000-watt light bulbs that may create a humming or buzzing noise. Based on the contractor's and Plank's observations, Plank obtained a search warrant to search the house.

The warrant process took several hours. In the meantime, other members of the Narcotics Task Force conducted surveillance of the house. At approximately 11:00 p.m., these officers saw a U-Haul truck drive past the house and park on the street for about ten minutes. Plank directed them to effect a traffic stop on the truck. Plank went to the area of El Camino and Westborough Boulevard, where the truck had been stopped. There, Officer Blundell had detained Guow Liao, Yueri Wu, and Hao Jiang. The officers seized keys from the men and Plank took the keys to the Exeter residence to check whether any of the keys fit any of the doors or locks. The keys did not fit any of the locks.

Plank executed the search warrant on the house. The house did not appear to be used for living purposes. There was no bedding in the bedrooms and no plates, pots, or pans in the kitchen. There were high-powered lights hanging from the ceiling in half of the two-car garage and trays with marijuana growing in them. There were three rooms

2

dedicated to growing marijuana on the second floor of the house and two rooms on the first floor being used for that purpose.  In total, Plank found 540 marijuana plants growing in the house.

There were thirty-three 1000-watt lights affixed in the light hoods in the five rooms over the marijuana plants.  Some of the trays for marijuana plants were not full or at their maximum capacity, so Plank surmised that some of the plants had either been taken out or moved to a different location.  The downstairs rooms had a low number of plants given the amount of space available.  Plank opined that the space was not being used optimally as grow operations tend to maximize the amount of plants.

Plank also found items of personal property in the house.  He found a black purse in one of the bathrooms on the second floor of the house.  Inside or next to the black purse, Plank found a DMV registration renewal notice with a due date of March 22, 2011, for a 2005 BMW addressed to defendant at an address on Francisco Street in San Francisco.  In addition, he found another DMV registration renewal notice for a 2003 Toyota, also addressed to defendant at the Francisco Street address, with a due date of May 31, 2011.  Other documents found included a collection notice dated February 25, 2011, from LDC Collection System addressed to defendant at the Francisco Street address for unpaid parking tickets for a third license plate number, a child's birth certificate with the mother listed as Hao Shun Huang (no father was listed), and a handwritten piece of paper with a set of names and numbers ranging from +120,000 to -7,000.  Plank explained that the paper could have been used to keep track of how much money was either being made inside the grow operation, the cost of the operation, or who got paid.  Finally, there was a room key and an express checkout paper from Cache Creek Casino Resort, listing the guest name as Jinglian Mei, with an arrival and departure date of April 6, 2011.

In the living room, Plank found additional documents including a letter from Chase Home Finance, a delinquent invoice from the City of San Bruno Utility Billing Department, and a Pacific Gas & Electric (PG&E) bill, all addressed to Leo Chang.  He also found prescription medications in the name of Paty Vu that were issued in 2008.

3

Plank explained that the 540 plants found in the house were at different stages of growth, from the beginning stage to the stage where the plants were ready to be harvested. On the low end, the plants would produce about two ounces of marijuana per plant, for a total of 67 pounds of marijuana if all of the plants completed their growth cycle. At the low end of the going rate at the time, the price per pound of marijuana was about $1,500, or a little over $100,000 for the 540 plants.

Plank did not find any processed marijuana at the house. He opined that the processing was likely being done at another location while the primary purpose of the Exeter house was cultivation.

The police called PG&E to determine whether the electricity meter for the Exeter house was bypassed. Joseph Torrigino, an electric troubleshooter for PG&E, investigated the meter at the Exeter house. Torrigino discovered that the meter had been bypassed—a new electrical panel had been installed in the bathroom wall and a pipe leading to the original meter had been cut. New connections had been added to allow the electricity to go through the new panel.

Moses Cain, a revenue assurance investigator for PG&E, explained that the electricity meter counts the amount of kilowatt hours that are being used in a home. PG&E bills its customers based on the number of kilowatt hours used. Cain testified that a meter bypass allows a customer to get electricity into the home without being billed for it. Under these circumstances, a small amount of electricity continued to go through the regular meter.

Cain testified that typical residential usage in San Bruno for a three or four-bedroom house is between 300 and 500 kilowatt hours per month, with the amount varying seasonally. He explained that in estimating how much electricity is being utilized by a meter bypass, he does a "load survey" to determine what is connected to the wires that have bypassed the meter. He counts the number of appliances connected to the bypass, and utilizing the Underwriters Laboratories's tags, which have ratings stating the amount of watts the appliance would use under the best of circumstances in one hour, he can multiply that amount by the number of hours the appliances are used on an average

daily basis. Using this information, he calculated that the Exeter house was using 402 kilowatt hours a day, about 30 times the normal usage for a typical residence in San Mateo County.

Cain also made certain assumptions in calculating the amount of electricity that bypassed the meter. First, he assumed that the bypass did not begin immediately upon commencement of service, because the grow cultivation process had not yet been established. Second, he reviewed the usage history, and in his experience, Cain found that most of the time usage will go up and then plateau once the bypass is in place. Finally, he assumed that the usage in the house was consistent—that the manner of the usage in all of the rooms upon discovery was the way they were used for cultivation during the bypass period.

PG&E's records showed that Leo Chang set up the electrical service for the Exeter house on May 6, 2004. After reviewing the electricity history for the Exeter house, Cain determined that there was a spike in service on September 22, 2008, to $157 per month in usage. Prior to this time, the average daily use at the property was only 1.16 to 1.21 kilowatt hours per day, approximately $5 per month. In October, the usage almost doubled to 48 kilowatt hours per day, and the usage stayed around that amount for another month and then dropped. After these three months, the average daily kilowatt use dropped and remained relatively flat at about $20.36 per month until the search warrant was executed on April 12, 2011. Cain testified that such low usage was unusual since in an ordinary residence, usage tends to fluctuate with the seasons, vacations, and other factors.

Based on a police report, which detailed the description of the rooms dedicated to growing marijuana, the lights and other appliances used in the grow operation, and the amount of time the appliances were used during the day,[1] Cain computed the loss to PG&E as $142,707.66.

---

[1] Cain testified that the lights and equipment were run on a timer, which was on a 12-hour cycle.

## B. The Valleywood House

On the evening of April 29, 2011, John Scafire was living next door to the house at 2331 Valleywood Drive in San Bruno. He heard a loud banging noise coming from the Valleywood house. He looked out his bedroom window and saw two men on the front porch of that house trying to kick down the front door. At one point, one of the men went down to the street and picked up a concrete block and threw it at the door. The door flew open, and the men entered the house. Scafire's wife called 911.

The men were inside the house for about two minutes before leaving in a black BMW sedan, heading west on Valleywood Drive. Officer Schimek responded to the dispatch call and effected a traffic stop on the BMW which was speeding. Defendant was the driver of the BMW. Kitae Chae was in the front passenger seat of the car.

Meanwhile, Officer Blundell responded to the Valleywood house and found an indoor marijuana cultivation operation. No one was in the house.

Blundell then learned that the BMW leaving the Valleywood house had just been stopped so he went to that location. When he arrived, defendant and Chae were still in the car, so he asked defendant to step out of the car. Defendant did so and consented to a search of his person. Blundell found that defendant had three cellular phones. Defendant also consented to a search of the BMW. In the trunk of the car, the police found a pouch containing $7,100 and defendant's wallet, which had his driver's license, credit and debit cards, $5,100 in cash, and numerous debit-type gift cards. The pouch also contained an iPod, some receipts, and two blank checks with defendant's name on the account. The trunk also contained Bounce fabric softener sheets, clothing, a vacuum, and dust masks.

In the BMW, the police also found a storage unit agreement in defendant's name for All Aboard Mini Storage. The storage unit was paid through April 30, 2011. In the glove compartment, the police found a postal service delivery notice addressed to Leo Chang at the Exeter house, defendant's Wells Fargo check book, a piece of paper listing various addresses and times with phone numbers and dollar amounts in the $2,000 to $3,000 range. Blundell also found a Bank of America statement in the name of Kevin K. Ng with an address in San Francisco, and a Medi-Cal denial letter addressed to

6

Hao Shun Huang with an address on Rivera Street in San Francisco. The glove compartment also contained a Cache Creek advertisement in the name of Virginia Pon with a post office box address in San Francisco. Pon was one of the residents of the Valleywood house.

In the driver's side door pocket, Blundell found a business card for DS Gardens with a website address of GreenGoldHydro.com, which based on his training and experience, was a hydroponic store selling items for indoor cultivation of marijuana. Behind the driver's seat on the floorboard, Blundell found a two-and-a-half-foot by three-foot vacuum-sealed plastic bag that contained a strong odor of fresh marijuana. The bag was empty. Blundell was aware that people involved in the cultivation and sale of marijuana use vacuum-sealed bags or food saver type bags to store and keep bulk marijuana.

There was also a GPS system in the car on the center dash. Under the recent history, Blundell found two addresses on Valleywood Drive in San Bruno.

Scafire identified defendant at the scene as one of the men he saw kicking the door of the Valleywood house. The police arrested defendant and subsequently interviewed him. Defendant told the police that he and Chae had been at a restaurant and were on their way to a bowling alley in Daly City. He said that he had not stopped at the Valleywood house. He also said that he was unaware of the vacuum-sealed bag in the car. He denied knowledge of the Exeter house. He said he had recently been in New Orleans. He claimed that he rented the storage unit for someone else, but when asked what was inside of the unit, he responded, "I don't want to answer that."

Officer Plank subsequently obtained a search warrant for the storage unit. In the storage unit, he found the same or similar white plastic growing trays as those found in the Exeter house. Some of the trays appeared to have been used. Plank also found several charcoal filters and some black plastic trays similar to the trays that were in the closets of the kitchen at the Exeter house, where the small marijuana plants were growing. The unit also contained a garden sprayer and 6-gallon fertilizer jugs of various types like those found at the house. Plank also saw fibrous Grodan cubes used for

7

developing the root system of marijuana plants. Some of them had been used. Additional items in the unit included a garden hose, high pressure fans, three light hoods, and blue plastic stools like the ones used to hold up the white trays in which the marijuana plants were growing at the Exeter house. Only 15 to 20 percent of the storage unit was being used; Plank opined that the unit was large enough to accommodate all of the growing equipment found at the Exeter house.

## C. The Defense Case

Defendant testified in his own defense. He had just returned from New Orleans when he was arrested on April 29, 2011. He travelled with Michael Cho and Henry Ng.[2] Upon his return, he discovered that Hao Shun Huang had stolen some jewelry from his safe at a flat on 35th Avenue in San Francisco. Defendant began dating Huang in July 2008. She became pregnant and gave birth to their child in August 2009. Huang subsequently gave birth to another child. Defendant, however, is not the second child's father.

After having dinner on April 29, defendant got "worked up" about Huang and decided to look for her. He thought she might be with Virginia Pon, Huang's friend. Defendant denied knowing Pon but knew of her friendship with Huang.[3] He had previously picked up Huang at Pon's house. Defendant owned three cars—a Toyota Forerunner, a BMW 545 and a Ford Econoline.

Defendant drove to Pon's house with Chae. He testified that he banged on the door after getting no response after ringing the doorbell. He also testified that he found a stone near the front of the house and used it to break open the door. He and Chae entered the house, but did not find anyone at home. He did, however, see marijuana plants with a lot of lights growing in one of the upstairs rooms of the house. He panicked and left the house with Chae.

---

[2] Cho testified and confirmed that he was in New Orleans with defendant in April 2011.

[3] He later testified that he met Pon and used to see Pon and Huang together.

Defendant testified that he was pulled over by the police shortly thereafter. The police searched his car. He claimed that the cash in his fanny pack in the trunk was from his gambling trip to New Orleans. He had planned to put $5,000 in the safe at the 35th Avenue flat, but after finding things missing, decided against putting it there. Most of the gift cards in his pack were gifts from casinos.

Defendant said that he rented the storage unit because Huang asked him to do so. He did not know how she planned to use it. He denied knowing Leo Chang and claimed he had never seen the DS Gardens business card. He also did not recognize the piece of paper with addresses, dollar amounts and phone numbers that was found in the car. He testified that Huang probably placed the Medi-Cal denial letter in the car.

Defendant further testified that he did not see the vacuum-sealed bag in the car but acknowledged in court that it had a strong odor. He admitted that he had lied to the police when he denied breaking into the Valleywood house. He claimed that he was in shock after seeing the marijuana growing in the Valleywood house.

Defendant testified that he had never been to the Exeter house. Of the items found near or in Huang's purse at the Exeter house, he testified that he gave the parking tickets to Huang to pay because she had incurred them. He did not recognize the handwritten paper with numbers and names on it or the Cache Creek casino resort papers. He claimed that he began to suspect Huang was involved in something illegal when the police told him what was in the storage unit. He testified that he was not in a relationship with Huang, but could not say when his relationship with her ended. He said they were "family" because of the children.

Huang testified that she dated defendant for about a year in 2008 and 2009 and they had an on and off relationship. In April 2011, she was living with defendant at the 35th Avenue flat in San Francisco. She used defendant's cars to get around.

When asked about the items found in the trunk of the BMW upon defendant's arrest, Huang testified that the Bounce sheets and dust masks belonged to her and that some of the clothing belonged to her children or to her friends. She said that she allowed

her friends to use the car. These friends included Virginia Pon, Leo Chang, and Yueri Wu. She did not know how the DS Gardens business card got inside the BMW.

Huang admitted that the purse found at the Exeter house was hers. She recognized the Cache Creek Casino Resort card and the keys to the 35th Avenue home. She, however, did not know how her purse got to the Exeter house. She claimed that she had never been there. She did not know when she lost it.

Huang testified that she asked defendant to rent a storage unit for Pon. She said that Wong and Wu moved things into the storage unit for Pon. Wu was Huang's boyfriend for a few months and he was the father of her second child. She testified that defendant supported her between 2008 and April 2011, and that she also received financial support from her family during that time.

Huang did not know that Chang had a house on Exeter Drive in San Bruno; she thought he lived in San Francisco. Huang was impeached by prior testimony in which she said she did not know Chang.

Huang was not aware of the vacuum-sealed bag found in the BMW. She did not know the smell of marijuana. She did not know that there was a large scale marijuana growing operation inside Pon's house. Initially, she claimed that she had never been to the Valleywood house. She later testified that she had been in the kitchen of the house once or twice, but did not notice any bright lights or strong smells. She did not know Pon's current whereabouts. Nor did she have an address for Chang.

Huang testified that she did not owe defendant anything even though she acknowledged that he paid her rent at the 35th Avenue residence. She admitted that she took some jewelry from the safe at the 35th Avenue home and that she pawned it in Oakland for $10,000.

## II. DISCUSSION

Defendant contends that the trial court violated his Fifth Amendment right to remain silent by relying on his lack of remorse in denying probation.

At the sentencing hearing, defense counsel argued for probation, asserting that defendant had no criminal history, was able to comply with the terms of probation, was

10

remorseful, and had a great deal of support in the community. Defense counsel further argued that the facts relating to the crime also supported probation. The prosecutor countered that the court should consider defendant's attitude toward the crime in determining whether to grant probation, and that while defendant had come close to admitting liability for the crime by stating in his letter to the court that he regretted the things that transpired and the choices he made culminating in his arrest, he had not admitted the crime.

The court agreed with the prosecutor and while acknowledging some of the good things defendant had done in his life, the court said that his friends and family did not know the other side of defendant: "During the course of this trial I was introduced to another Kenny Kong. The fact that his friends and family are not aware of that Kenny Kong in no way diminishes the fact that that Kenny Kong does, in fact, exist as determined by a jury of his peers in this particular case. [¶] Not once has Kenny Kong acknowledged responsibility for the wrongdoing that took place in this particular case. My review of all of the documentation that I've been presented with would seem to indicate that Kenny Kong is still denying any responsibility and any participation in the events which led to his conviction on three felony charges. That's troubling. And that is not someone that this Court thinks is necessarily worthy of the leniency and the consideration that is urged upon this Court by those individuals so intimately familiar with the other Kenny Kong."

Defense counsel, in turn, argued that defendant "has exercised his right to a jury trial twice and testified at both jury trials, and I was present at both. Ms. Allhister [deputy district attorney] was present at both, and he has been consistent in his—in his discussion. He opened himself up to cross-examination twice. He has been consistent, and for him to now come to this Court and completely disavow anything he previously said, I can't ask him to do that, and I hope that he wouldn't do that because I—because simply because that's what the Court and the parties obviously want to hear. It would be easy for him to do that, but I don't know if that would be the truth. [¶] And I don't— I've struggled with this. And I think that—I think that there has to be a place for

11

somebody to be sentenced that exercises their right to a jury trial and testifies, and I don't think there was any specific finding that he was untruthful during his testimony. [¶] But the facts of the case, [and] the evidence of the case were circumstantial, and the jury seemed to find that the circumstantial evidence was enough and we are—I have accepted that. [¶] I am having trouble still coming to grips with that, but in my professional career I'm trying to accept it. Mr. Kong is doing the same. And I just ask the Court not to use the fact that he has maintained his innocence against him and not to punish him because of that. . . ." The court responded that it had not found defendant to be truthful during his testimony and stated, "this Court is not in the business of punishing anyone for exercising their right to a jury trial, but this Court is a steadfast believer in someone sticking to the oath that they take before they do so testify." It denied probation, stating: "You've expressed no remorse whatsoever for your behavior; you're an active participant in the commission of the offense; you have yet to acknowledge participation in the offense; and you have not accepted responsibility for your role in the offense. Instead, you continue to blame others for everything that transpired . . . ."

Defendant contends that the court's comments implicated his Fifth Amendment right against self incrimination.[4] We agree that a defendant retains the right to remain silent at sentencing. (*Mitchell v. United States* (1999) 526 U.S. 314, 328;[5] *People v. Coleman* (1969) 71 Cal.2d 1159, 1168, overruled on other grounds in *Garcia v. Superior Court* (1997) 14 Cal.4th 953, 966, fn. 6.). As the Attorney General explains, however, defendant has not cited any federal case in which the court's consideration of defendant's

---

[4] The Attorney General argues that defendant has forfeited this issue on appeal because his defense counsel did not object to the court's reasons for denying probation on Fifth Amendment grounds. (See *People v. Scott* (1994) 9 Cal.4th 331, 353.) Although defense counsel did not explicitly state the Fifth Amendment as the reason for defendant's insistence on maintaining his innocence, we believe defense counsel's comments adequately raised the issue of defendant's right to remain silent. Even if counsel's comments were lacking, we address the issue on the merits to obviate a claim that defense counsel was incompetent.

[5] The *Mitchell* court did not consider "[w]hether silence bears upon the determination of a lack of remorse . . . ." in sentencing issues. (*Id.* at p. 330.)

12

lack of remorse in denying probation was found to violate the Fifth Amendment. (See *United States v. Caro* (4th Cir. 2010) 597 F.3d 608, 630–631 (*Caro*) [holding that defendant's silence cannot be considered in determining lack of remorse as an aggravating factor in sentencing but noting that circuit courts are divided on the issue]; *United States v. Safirstein* (9th Cir. 1987) 827 F.2d 1380, 1388 (*Safirstein*) [court may not penalize a defendant for exercising his privilege against self-incrimination by *enhancing* his sentence based upon his failure to cooperate by implicating others or to admit guilt to uncharged crimes].) These courts were not concerned with considering a defendant's lack of remorse—a factor relating to a defendant's character—in deciding whether to grant or deny probation. (See Cal. Rules of Court, rule 4.414(b)(7).) Rather, they were concerned with whether remorse bore on imposing a sentence enhancement. (*Caro, supra,* at pp. 630–631 [death sentence]; *Safirstein, supra,* at pp. 1384–1389 [consecutive maximum terms].) But whether a defendant is remorseful is a proper consideration for the court in making its decision to grant or deny probation (Cal. Rules of Court, rule 4.414(b)(7)) "unless the defendant has denied guilt and the evidence of guilt is conflicting."[6] (*People v. Holguin* (1989) 213 Cal.App.3d 1308, 1319.)

Defendant asserts that the evidence here was circumstantial and contested and thus the court abused its discretion by denying probation on the ground that defendant lacked remorse. The evidence, though largely circumstantial, overwhelmingly established defendant's guilt. The evidence not only linked defendant to the Exeter house, where a large marijuana grow operation was underway, but also to the storage unit which contained many of the same types of items used at the Exeter house. Documents

---

[6] The federal sentencing guidelines similarly allow a sentence reduction when a defendant shows remorse and accepts responsibility for his actions. (See *United States v. Mikos* (7th Cir. 2008) 539 F.3d 706, 718 [citing United States Sentencing Guidelines § 3E1.1 (18 U.S.C.S. Appx. § 3E1.1), and recognizing that courts consider failure to accept responsibility inasmuch as the guidelines permit courts to give lower sentences to persons who confess and show remorse]; *United States v. Gordon* (4th Cir. 1990) 895 F.2d 932, 936–937 ["a defendant is not penalized for failing to accept responsibility. Rather, acceptance of responsibility is a mitigating factor available under appropriate circumstances"].)

connecting defendant to the Exeter house were found in both the house and in defendant's BMW. Further, defendant had rented the storage unit just a week before the Exeter house was sold in a foreclosure sale, and the jury could very well have inferred, as the People argued below, that defendant was in the process of moving the grow operation to the storage unit when the Exeter house was discovered. The evidence found in defendant's car also provided evidence of his participation in the grow operation. Along with the storage agreement in his name for the storage unit, the police found a notice addressed to Leo Chang at the Exeter house, a vacuum-sealed bag with a strong odor of marijuana, and additional items that are used in a marijuana grow operation including the Bounce fabric softener sheets, a vacuum, dust masks, and large amounts of cash. And, defendant was linked to the Valleywood house, where another grow operation was in place, and lied to police about having been there on the evening of his arrest.

Finally, as the court found, defendant's testimony as well as that of Huang, who sought to corroborate defendant's story, lacked credibility. For example, their story that they rented the storage unit for Pon, Huang's friend, was implausible. Defendant's name was on the contract, he knew the code for the unit, and he admitted he paid for it and was never reimbursed. He rented the unit in San Francisco even though Pon lived in San Bruno. Upon his arrest, he refused to tell the police what was in the unit. Defendant initially claimed that he had never met Pon, but later testified that he met her and saw her with Huang. He had not noticed the vacuum-sealed bag found in his car even though it had a strong odor of marijuana. He could not account for how the incriminating items found in his car came to be there. Further, defendant claimed that he did not know Leo Chang even though a delivery notice addressed to Chang was found in his car.[7] As the court found, "I've seen a lot of witnesses testify in court, and I've been called upon to judge the credibility of a lot of witnesses that testify in court, and I will say in all honesty there's no question in my mind that Mr. Kong was not truthful when he testified in this

---

[7] Huang initially testified that she did not know Chang, but later acknowledged that she knew him and allowed him to use defendant's BMW.

14

courtroom, and I think that was born [sic] out by the verdict that the jury rendered." The jury had compelling evidence before it on which to rest its verdict. On this record, the trial court did not abuse its discretion in considering defendant's lack of remorse in denying probation.

Defendant next contends that the trial court's order requiring him to pay PG&E $156,977 in restitution exceeded the maximum amount of restitution authorized by the jury's verdict and thus violated his Sixth Amendment right to a jury trial under *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and its progeny. In *Apprendi*, the United States Supreme Court held that a defendant is entitled to have a jury determine any fact that increases the penalty for a crime beyond the prescribed statutory maximum. (*Id.* at pp. 489–490.)

Citing *Southern Union Co. v. United States* (2012) 132 S.Ct. 2344, 2350 (*Southern Union*), defendant contends that the restitution awards are tantamount to criminal fines and hence a jury finding is required to determine the fine's maximum amount in order to comply with *Apprendi*. In *Southern Union*, the United States Supreme Court held that *Apprendi* applies to the imposition of criminal fines. There, the defendant company was convicted of an environmental offense which provided for a maximum fine of $50,000 for each day the relevant statute was violated. (*Id.* at p. 2349.) The court determined the number of days the statute was violated as the question had not been submitted to the jury. (*Ibid.*) The United States Supreme Court reversed, holding that the trial court's finding violated *Apprendi*. (*Id*. at p. 2357.) It explained: "*Apprendi's* 'core concern' is to reserve to the jury 'the determination of facts that warrant punishment for a specific statutory offense.' [Citation.] That concerns applies whether the sentence is a criminal fine or imprisonment or death. Criminal fines, like these other forms of punishment, are penalties inflicted by the sovereign for the commission of offenses." (*Southern Union, supra*, at p. 2350.)

Defendant's reliance on *Southern Union* is misplaced. California courts have uniformly rejected the argument that the Sixth Amendment right to a jury trial applies to a restitution hearing (see *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1183–

15

1184, and cases cited) and have concluded that victim restitution does not constitute an increase in punishment. (*People v. Millard* (2009) 175 Cal.App.4th 7, 35–36 [primary purpose of victim restitution is to provide victim with compensation for victim's injuries]; *People v. Harvest* (2000) 84 Cal.App.4th 641, 649 [victim restitution is a civil remedy rather than a criminal punishment].) In *Millard*, the court specifically rejected defendant's contention that he is entitled to a jury trial on the issue of restitution. "Penal Code section 1202.4's requirement that a trial court issue an order providing for full restitution of a victim's economic losses does not constitute a sentencing choice by the trial court. Rather, because that statute requires the court to award the victim full restitution, the court's determination of that amount in a restitution hearing by a preponderance of the evidence does not involve a defendant's Sixth Amendment right to a jury or proof beyond a reasonable doubt." (*Id.* at p. 36.) We agree with the *Millard* court's analysis and therefore reject defendant's argument.[8]

### III. DISPOSITION

The judgment is affirmed.

---

[8] Defendant also cites *Paroline v. United States* (2014) 134 S.Ct. 1710 in support of his argument that restitution is a criminal punishment. *Paroline* addressed a victim's entitlement to restitution under title 18 United States Code section 2259, a statute addressing restitution for victims of child pornography. It does not contend with the question of whether the Sixth Amendment right to a jury trial applies to restitution orders.

16

_____
Rivera, J.

We concur:

_____
Ruvolo, P. J.

_____
Reardon, J.